350 So.2d 881 (1977)
GEORGE ENGINE CO., INC.
v.
SOUTHERN SHIPBUILDING CORPORATION, Alain R. Seligman and Roger Seligman.
Nos. 59307, 59410.
Supreme Court of Louisiana.
September 19, 1977.
R. King Milling, Charles M. Steen, W. Richard House, Jr., Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, Maurice LeGardeur, Burns, Farmer & Le-Gardeur, Covington, for plaintiff-relator.
*882 John N. Gallaspy, Gallaspy & Paduda, Bogalusa, Charles Lee Eisen, Richard C. Stearns, Hill, Christopher & Phillips, Washington, D. C., for defendants-respondents.
SUMMERS, Justice.
By three separate instruments dated October 12, 1972 George Engine Company, Inc., contracted to have Southern Shipbuilding Corporation construct three tug supply vessels designated as Hulls 107, 108 and 109. These vessels were designed and intended to be sold by George to companies engaged in offshore oil operations. By the terms of the contracts, delivery, after required trials, was prescribed as follows: Hull 107 on October 12, 1973; Hull 108 on November 12, 1973; and Hull 109 on December 12, 1973. The contracts were signed by Alain Seligman individually and as president of Southern.
Thereafter on June 7, 1973 the parties executed two additional contracts for the construction of vessels with hull numbers 110 and 111 providing for delivery dates of March 30, 1974 and April 30, 1974, respectively.
A dispute arose between the parties concerning the delivery dates and the ultimate contract price of the vessels.
On August 20, 1974 Southern wrote George claiming that because of "force majeure" situations and economic developments a complete review of construction contracts was imperative. Completion of the vessels for the current contract price under prevailing conditions was, according to Southern, completely unreasonable and impossible. Unless an escalation of the contract price could be agreed upon Southern would be compelled to "phase down" construction of the vessels. Several following letters from Southern were to the same effect.
Under these circumstances negotiations were entered into in an effort to resolve the differences. As a result, on September 19, 1974, an agreement was entered into setting forth that time was of the essence in the performance of these construction contracts. Provision was made for revised delivery dates, increased liquidated damages Southern would have to pay George for failure to comply and making George liable in liquidated damages to Southern for delays due to acts or omissions of George.
By this September 19, 1974 agreement George agreed to pay Southern the sum of $400,000 as a "performance bonus" in addition to the contract price for construction of the five vessels. The agreement also contained the following arbitration clause:
"The parties hereto agree:
(a) That any controversy or claim arising out of or relating to the construction contracts, as amended by this Agreement, or any breach thereof, shall be settled by arbitration in accordance with the rules of the American Arbitration Association (hereinafter referred to as AAA), except to the extent that the rules of the AAA are in conflict with this Agreement;
(b) That any controversy or claim arising out of or relating to the Construction Contracts, as amended by this Agreement or any breach thereof, shall be submitted to three (3) arbitrators to be selected within five (5) days after request for arbitration; one (1) to be appointed by George, one (1) to be appointed by Southern, and the third (3rd) to be selected by the two (2) so appointed from the Panel of Arbitrators of the AAA. In the event that the two (2) arbitrators appointed by the parties cannot agree as to the selection of the third (3rd), such third (3rd) arbitrator shall be appointed by the AAA.
(c) That the decision of the aforementioned arbitrators or that of any two (2) of them shall be final.
(d) That they will abide by and conform with any final award rendered by the arbitrators, and
(e) That a judgment on any award so rendered may be entered in any court having jurisdiction thereof."
Thereafter, on November 12, 1976, George instituted suit against Southern and Alain R. Seligman based upon contracts of October 12, 1972 and June 7, 1973 for the construction of the five tug supply vessels.
*883 The petition alleged that Southern's letter of August 20, 1974 advised that unless it was paid an additional amount under each of the five contracts Southern would phase down the construction of all five vessels thus effectively terminating the contracts.
As a result, faced with Southern's threat to "phase down" construction and the prospect of being unable to fulfill its obligations to its intended vendees engaged in offshore oil operations, George entered into the agreement of September 19, 1974. This agreement was reached only because George understood that Southern had ascertained in advance that there were no impediments to Southern's ability to deliver each vessel on or before the revised delivery dates specified in the September 19, 1974 agreement.
The petition further alleges that George was advised by Southern that the delivery dates were established after Southern had ascertained from each of its major suppliers of materials that materials could be furnished in time for prompt delivery of each vessel on the dates specified.
When the agreement was executed Southern knew or should have known that mud tanks required for two of the vessels were no longer being manufactured and that the suppliers of propeller shafts and rudder stocks were struck by its employees, and the strike continued through November 1974. Southern failed to inform George of these facts, knowing that they constituted impediments to timely delivery. The vessels were therefore not in fact delivered timely.
George alleges that had it known of the impediments to timely delivery it would not have entered into the agreement of September 19, 1974 and would have pursued its remedy for breach of contract against Southern.
As a result of the misrepresentation of material facts constituting error in the principal cause of the agreement, a total lack of consideration and a nonexistent motive, George alleges it is entitled to a rescission of the agreement of September 19, 1974 and a return of the $400,000 paid as a performance bonus and $482,200 in liquidated damages. Alternatively, George seeks $840,000 as liquidated damages for late delivery.
To this petition Southern filed a motion to stay the proceedings and for summary judgment in its favor. The motion alleges that George initiated arbitration proceedings before the American Arbitration Association on February 11, 1976 and is in the position of one who, having agreed to and commenced arbitration now prefers to suspend those proceedings and burden the court with matters which are better settled through arbitration with a saving of time and cost for all parties. The motion asserts as grounds for the summary judgment that there is no genuine issue of material fact alleged in plaintiff's petition.
After a hearing on January 12, 1977 the trial judge granted the motion to stay the court proceedings and ordered George to proceed with the arbitration of its claim. George applied to the First Circuit for writs to review the ruling and also moved for a suspensive appeal. The application for writs and the motion for suspensive appeal were denied. Applications to this Court to review these rulings were granted. La., 342 So.2d 1114; La., 342 So.2d 1115. The matter, we feel, is properly presented by the writ application to review the ruling granting the stay order. The writ to review the ruling denying the suspensive appeal is recalled as improvidently issued.
In its brief George sets forth that the threats to "phase down" construction contained in Southern's letter of August 20, 1974 and those following created a situation which required the filing of a suit against Southern by one of the third party purchasers in the United States District Court seeking specific performance. The injunction sought was denied by the United States District Court. When this relief was not forthcoming George, faced with Southern's threats to phase down construction, commenced negotiations to insure continued construction and prompt completion of the vessels. George's customers were depending on these vessels for supplying and *884 equipping offshore oil and gas production. According to George's brief, Southern was specifically requested to contact suppliers to determine whether critical materials could be delivered in time to meet the stipulated delivery dates. Having been assured that there was no impediment to timely delivery, George signed the agreement of September 19, 1974. The representations upon which it relied, George asserts, were later learned to be false. Apparently Southern did not verify the delivery date of materials and had no assurance that the vessels could be completed on time.
The issue thus presented is whether a party to a contract containing an arbitration clause may sue to rescind that contract in a court of competent jurisdiction on the ground that it is, and was, void ab initio.
George's position is that four requisites are necessary to the validity of all contracts, one being the consent of the parties legally given. La.Civil Code art. 1779(2).[1] The argument is that George's consent to the agreement of September 19,1974 lacked this essential requisite because its consent was vitiated through error, misrepresentation and coercion on the part of Southern at the time of the confection of the contract. It is a threshold issue. George seeks by this suit to litigate the merits of that issue. However, the stay order imposed by the trial judge prevents such an adjudication. Instead George has been ordered to comply with an arbitration clause contained in a contract which it contends has never been validly confected.
The Louisiana Arbitration Act (La.Rev. Stat. 9:4201-17) pertinently provides in Section 4201:
"A provision in any written contract to settle by arbitration a controversy thereafter arising out of the contract . . . shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (emphasis added).
A study of the agreement of September 19, 1974 and the incorporated construction contracts together with the quoted arbitration clause evinces no intent of the parties to specifically arbitrate the issue of error in the inducement of the agreement; nor is the language in the agreement broad enough to comprehend arbitration of that issue. Atcas v. Credit Clearing Corporation of America, 292 Minn. 334, 197 N.W.2d 448 (1972). To the contrary, a stipulation in the agreement "that when such matters are submitted to arbitration" refers to cause and extent of delays in delivery of the vessels and the assessment of liquidated damages, matters properly subject to arbitration. It would be an absurdity to compel arbitration of the conditions in a contract which does not exist in its entirety in legal contemplation.
This Court's jurisdiction cannot be displaced whenever a contract contains an arbitration clause. The arbitration law and arbitration clauses in contracts do not vest in arbitrators the historic jurisdiction of the courts to determine fraud or duress in the inception of a contract. It may be said that courts are far better qualified to decide issues of this kind. These are not questions of "construction law", particularly applicable to the building of boats, nor is a question of fact involved that arbitrators are peculiarly well qualified to consider.
Nor does Section 4201 of the Arbitration Act compel arbitration of a question involving the validity ab initio of a contract containing an arbitration clause. While provisions for arbitration of controversies arising out of contracts are declared to be valid, irrevocable and enforceable, validity, irrevocability and enforceability are by the terms of Section 4201 made dependent upon "such grounds as exist at law or in equity for the revocation of any contract." Stone v. Stone, 292 So.2d 686 (La.1974). By its very terms Section 4201 presupposes the existence of a valid contract as a basis for invoking arbitration.
*885 Southern relies upon the decision in Bodman, Murrell & Webb v. Acacia Foundation of L.S.U., Inc., 246 So.2d 323 (La.App.1971), certiorari denied, 258 La. 766, 247 So.2d 864 (1971) in support of its position. The Bodman case holds that Section 4201 "can be reasonably interpreted to mean only that there must exist grounds for the revocation of the arbitration provision itself, apart from the grounds that may exist for the revocation of the remainder of the contract, before a party thereto can avoid the enforcement of its provisions." While the opinion of this court in Stone v. Stone, supra, states that Bodman was correctly decided, it was careful to point out that the broad rationale of the Bodman decision was not being decided. Moreover, the Bodman case can be distinguished from the case at bar in the following respect: the Bodman case involved a factual issue of contract performance, whereas the case at bar involves the legal issue of the validity in its inception of the contract itself, based on the alleged lack of valid consent.
Aside from a natural reluctance to surrender the historical jurisdiction of courts to decide the legal issue presented by a petition to rescind a contract on account of error in its inducement, arbitrators are designated to arbitrate and resolve factual controversies arising out of valid contracts between the parties. They need not be lawyers and in all probability are wholly unqualified to decide legal issues. Indeed they are not bound to apply the law. Arbitration, moreover, deprives a party of a jury trial and the right to appeal, substantial rights which should not be denied unless voluntarily and knowingly waived. It was in all probability to preserve these rights and to limit arbitration within proper bounds that the Legislature created an exception to the enforceability of arbitration provisions in contracts where "grounds . . . exist at law or in equity for the revocation of any contract." La.Rev.Stat. 9:4201.
Reference to Section 4203 of the Arbitration Law further supports the view that the issue presented here is properly decided by the court and not by arbitration. The section provides a remedy to the party aggrieved by the alleged failure or refusal of another to perform under a written agreement to arbitrate. A petition to a court having jurisdiction is authorized for an order directing arbitration to proceed allowing five days for the party in default. Thereafter, the Section sets forth that the court shall hear the parties, "and upon being satisfied that the making of the agreement for arbitration . . . is not an issue" the court shall order arbitration. Again the Arbitration Law excepts the issue of the validity of the principal agreement from compulsory arbitration. If the court finds that "the making of the agreement for arbitration" is "at issue" the section then specifically directs that the court shall hear and determine that question, reserving to the parties the right to trial by jury. Thus, by reading Sections 4201 and 4203 together, the legislative intent becomes clear. These sections simply say that an arbitration agreement is to be enforced by the court unless the court, not the arbitrator, finds grounds "at law or in equity for the revocation of any contract."
Lack of consent, of course, is one of the grounds for revoking a contract. It is a vice which rescinds the contract from its inception. Consequently, without valid consent there is no contract to be arbitrated. Surely a court would not be expected to compel arbitration of the conditions in a contract which does not exist in legal contemplation. Here the validity of the entire contract of which the arbitration clause is a part is called into question by George. If the agreement lacked the valid consent of George it cannot be said that George "voluntarily" waived its right to have the court determine whether the agreement should be rescinded and declared void ab initio.
It is recognized that arbitration finds its principal support in the knowledge, experience and expertise of the arbitrator which qualify him to decide factual questions in regard to the day-to-day performance of contractual obligations, and the speed at which arbitration, as contrasted to litigation, can resolve disputes over performance *886 of contracts and thus mitigate the damages and allow the parties to continue performance under the contracts. However, arbitration serves neither of these functions where an entire contract is sought to be rescinded on the ground of lack of valid consent. Courts have far more expertise in resolving legal issues which go to the validity of a contract than do arbitrators and that resolution can be made just as expeditiously as it can be by arbitrators.
Southern has relied to a considerable extent upon the authority of the decision in Prima Paint Corp. v. Flood & Conklin, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). That decision interprets the Federal Arbitration Act (9 U.S.C. §§ 1-14) and holds that the issue of fraud in the inducement of a contract generally must be submitted to arbitration when the contract contains an arbitration clause. Although ordinarily this opinion by the United States Supreme Court would bear great weight upon our decision, in the instant case reason and law in this Court's view weigh more heavily in favor of the dissenting opinion of Mr. Justice Black joined in by Mr. Justice Douglas and Mr. Justice Stewart as the reasons assigned herein will demonstrate. Further justification for adopting the dissenting view is found in the circumstance that a state statute is being interpreted and no federal question or federal constitutional principle is involved which compels this Court to follow the views expressed by the United States Supreme Court. Under these circumstances Louisiana's highest court is free to interpret this State's law in accordance with its understanding of the legislative intent and its appreciation of what is more logical, reasonable and just.
For the reasons assigned, the ruling of the trial court staying this suit for rescission of the agreement of September 19, 1974 is annulled and set aside, and the case is remanded to the trial court to be proceeded with in a manner not inconsistent with the views expressed in this opinion. On remand the trial judge shall determine the validity of George's consent to the agreement of September 19, 1974. In the meantime arbitration proceedings will be stayed until the issue of consent has been determined by the court.
TATE, J., dissents and assigns reasons.
TATE, Justice, dissenting.
I respectfully dissent.
The persuasive majority opinion is in accord with interpretations reached by a number of other of American jurisdictions with similar arbitration statutes. Nevertheless, I am in accord with the contrary view of a nearly equal number of other jurisdictions, as well as of the doctrinal writers, that such an interpretation destroys the very purpose of the arbitration statutes and of arbitration agreements confected in accordance therewith. See Domke on Commercial Arbitration, Sections 8.01-8.06 (1968).
The interpretation reached by the majority permits a party to an arbitration agreement who desires to avoid arbitration, to delay it indefinitely. By suing to rescind the parent contract itself on grounds of fraudulent inducement, however groundless the claim, he may thus avoid arbitration until termination of the judicial proceedings, including appellate review, which adjudicate the validity of the claim for rescission.
By La.R.S. 9:4201, the legislature provided that "A provision in any written contract. . . to settle by arbitration. . . or an agreement . . . to submit to arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
The statutory language may reasonably be interpreted to mean, as a substantial number of courts (including the United States Supreme Court) have, that the arbitration agreement is irrevocable and enforceable unless the arbitration agreement itself (not a parent contract) may be revoked upon such grounds as other contracts may be revoked. Prima Paint Corp. v. Flood & Conklin, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Domke, cited above.
*887 Indeed, the Louisiana Court of Appeal, First Circuit, so held. Bodman, Murrell & Webb v. Acacia Found, of LSU, 246 So.2d 323 (La.App.1971), cert, denied, 258 La. 766, 247 So.2d 864 (1971). Bodman held, with regard to the italicized language, that it meant "only that there must exist grounds for the revocation of the arbitration agreement itself, apart from the grounds that may exist for the revocation of the remainder of the contract, before a party thereto can avoid the enforcement of its provision." 246 So.2d 326.
Despite an arbitration agreement, we have nevertheless held that some matters are non-arbitrable because of rights given by substantive law, such as the right to dissolve a partnership of indefinite duration, Stone v. Stone, 292 So.2d 686 (La. 1974), or matters not subject to non-judicial determination, such as child-custody rights, see Stone at 292 So.2d 691.
However, as earlier noted the better view that the determination of whether the parent contract itself is rescindable for error or fraud is not such a non-arbitrable issue that must always and necessarily be decided by judicial proceedings rather than by arbitration.
Where the parties freely consent to arbitration of future disputes arising out of or relating to a contract, and their consent to the arbitration agreement itself is not based upon any fraud or misrepresentation as to it, the very purpose of their full consent to the arbitration agreement is to avoid the expense, delays, and uncertainties of litigation regarding the validity of either the contractual undertaking itself or the contractual performance.
Here, the parties amended the initial contracts, after disputes as to them had arisen, and then agreed in writing to submit to arbitration "any controversy or claim arising out of or related to the construction contracts, as amended by this Agreement." No claim is made that both parties did not freely intend to arbitrate all future disputes relating to the contract, nor that any misrepresentation induced either party to enter into such arbitration agreement (which is separable from the parent contract itself) and specifically reject litigation as the means of resolving future disputes.
Nevertheless, the majority in effect holds that, no matter what the intention of the parties, they may never agree to submit to future arbitration the issue of the rescindability of the parent contract upon any existing ground "at law or in equity for the revocation of any contract." La.R.S. 9:4201.
To interpret the statutory language so, obviously opens up to either party his unilateral
option to postpone indefinite arbitration. He may do so, once an arbitrable dispute arises, by filing judicial proceedings urging grounds for rescission of the parent contract. Arbitration would not then be available until the courts had finally determined to be meritless the grounds so advanced for rescission.
The interpretation thus reached by the majority defeats the purposes of the arbitration statute. The enactment authorizes parties to make irrevocable agreements to arbitrate future disputes arising out of a contract. The purposes are both to afford ready and efficient non-judicial means to resolve disputes relating to the contract, as well as to divert these disputes from the courts so as to avoid contributing to (and their speedy resolution being prejudiced by) congestion and delay in the litigation process.
The majority's interpretation thus permits any party, contrary to the intent of the statute and of the arbitration agreement itself, to postpone indefinitely arbitration and to require prior resort to the judicial machinery, upon a simple ex parte claim that the parent contract is rescindable, despite that party's previous agreement to submit to arbitration any such claim along with all other claims relating to the contract.
Mr. Justice Holmes observed that, in statutory interpretation, "the general purpose is a more important aid to meaning than *888 any rule which grammar or formal logic may lay down." United States v. Whitridge, 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696 (1905). In my opinion, the majority has ignored the purposes of the statutory enactment validating and encouraging arbitration agreements. In interpreting the statutory exception to valid arbitration agreements otherwise authorized by La.R.S. 9:4201, the majority has construed the exception so broadly as to destroy the purposes of the statute as a whole, rather than narrowly in accord with and so as to serve such statutory purposes.
I therefore respectfully dissent.
NOTES
[1] La.Civil Code art. 1779: 
"Four requisites are necessary to the validity of a contract:
1. Parties legally capable of contracting.
2. Their consent legally given.
3. A certain object, which forms the matter of agreement.
4. A lawful purpose."