376 So.2d 1040 (1979)
GEORGE ENGINE COMPANY, INC.
v.
SOUTHERN SHIPBUILDING CORPORATION et al.
No. 12785.
Court of Appeal of Louisiana, First Circuit.
October 8, 1979.
Writ Refused November 30, 1979.
R. King Milling, W. Richard House, Jr., New Orleans, Maurice J. Le Gardeur, Jr., Covington, for plaintiff, George Engine Company, Inc., appellant.
*1041 John N. Gallaspy, Bogalusa, Charles Lee Eisen, Washington, D. C., for defendants, appellees.
Before COVINGTON, LOTTINGER and COLE, JJ.
COLE, Judge.
George Engine Company, Inc. (George), brought suit for rescission of contract asserting that its consent was vitiated by error in the principal cause. Named as defendants were Southern Shipbuilding Corporation (Southern) and two individuals, Alain R. Seligman and Roger Seligman, who agreed to be bound in solido with Southern for the faithful performance of the contract. This case was previously before the Louisiana Supreme Court on supervisory writs to determine if the arbitration clause in the contract which George sued to rescind required the issue of valid consent to be submitted to arbitration. The Supreme Court held that a party to a contract containing a mandatory arbitration provision could sue in a court of competent jurisdiction to rescind the contract on the ground that it was void ab initio. George Engine Co. v. Southern Shipbuilding Corp., 350 So.2d 881 (La. 1977). Accordingly, the case was remanded to the district court for a determination of the validity of George's consent. The trial court held the disputed contract to be valid and enforceable. George appeals.
The contract which is the subject of this suit [the Amendment] was signed by the parties on September 19, 1974. It modified and incorporated by reference the terms and conditions of five previously executed contracts for construction of five vessels. George asserts that Southern made material misrepresentations which constitute error in the principal cause of the contract. George maintains its principal motive or cause for agreeing to the Amendment was to secure from Southern firm and fixed delivery dates predicated upon information Southern had sought and received from its suppliers concerning the availability of materials. Southern freely admits it never made inquiries of its suppliers prior to incorporating new delivery dates into the Amendment. Moreover, Southern asserts George never asked it to consult its suppliers and Southern never represented it had done so.
The threshold issue on this appeal is whether firm, fixed, realistic delivery dates predicated upon the absence of supply problems were George's principal motive for agreeing to the Amendment.
On October 12, 1972, George contracted with Southern for construction of three tug supply vessels designated as Hulls 107, 108, and 109. These vessels were to be delivered in sequence on October 12, 1973, November 12, 1973, and December 12, 1973. On June 7, 1973, the parties executed two additional contracts for the construction of Hulls 110 and 111, which were to be delivered on March 31, 1974 and April 30, 1974. After contracting with Southern, George, in accordance with its usual business practice, entered into agreements with Transunion Vessel Leasing Corporation and J. Ray McDermott & Co., Inc. for the sale of the completed vessels.
The delivery dates set forth in the five original contracts were not met. A determination of the reasons and responsibility for the delays is not necessary for the disposition of this appeal. However, we note that Southern attributed the delays which occurred prior to the execution of the Amendment to labor and material shortages, untimely delivery of materials by suppliers, and change orders issued by George requiring modifications in the design and construction of the vessels.
L. L. Frierson, president of George, testified that when he became concerned about the delay in construction he met with Alain Seligman, president of Southern, and was told there were problems with procurement. Revised delivery dates were given but these too could not be met. According to Frierson, Southern made several revisions of the delivery dates and promised timely delivery repeatedly. The new dates were never honored. Southern's excuse for the additional delays was procurement problems. Evidence *1042 on these incidents, excluded by the trial court as irrelevant, was presented by George under a proffer. Disagreeing with the trial court's assessment of relevancy, we accepted into evidence the proffered testimony and exhibits.
In December 1973, Seligman approached Frierson and asked for an escalation in the contract price to cover the increased cost of materials. He claimed the delays caused by George's change orders had put Southern in the position of having to pay greatly increased prices for materials. Frierson responded by sending his auditors to Southern to verify the escalation. Seligman testified that for nine months he made repeated and frequent requests for cost of escalation, but Frierson never gave him an answer. On August 20, 1974, Seligman wrote a letter to Frierson in which he stated Southern would immediately phase down construction of the vessels if George did not agree to pay the cost of escalation.
Frierson testified this threat to stop construction put George in a very bad position with its lenders, including the customers who had contracted to buy and finance construction of the vessels. George feared that if construction stopped Transunion Vessel Leasing Corporation would withdraw its financing, which amounted to approximately $3.5 million advanced on demand notes. According to Frierson, Transunion Vessel Leasing had previously expressed its concern about the numerous delays in construction and had hinted it might end its financing. Additionally, George was aware the purchasers of the vessels were very anxious to get delivery. Hull 107, which was only two weeks from completion on August 20, 1974, had been committed by its purchaser to commence work in September off the Nigerian coast.
On September 13, 1974, suit was filed in federal court seeking a mandatory injunction to compel Southern to perform under the five original contracts. The court denied injunctive relief on September 16, 1974. At that point, George, after consultation with counsel, decided to resume negotiations with Southern.
Representatives and counsel for the two corporations met on September 18, 1974, to negotiate the terms of a settlement. There was a second meeting the next day at which the amending contract, subject of this suit, was signed. There is considerable dispute among the witnesses as to what was said about delivery dates at those two meetings.
Frierson, Herbert Colby, senior vice president of George, and Michael Crow, attorney for George, all testified that George had agreed to discuss Southern's claim for escalation only after receiving assurance that Southern could offer firm delivery dates. Frierson explained it was important to George to get Southern's commitment to delivery dates based on information from suppliers because George had to be able to assure its lenders and customers that there would be no further delays. According to these three witnesses, Seligman was questioned closely on September 18 about the proposed delivery dates and was told that George wanted realistic dates that Southern was sure it could meet. Colby testified he instructed Seligman to be liberal in calculating the delivery dates and to push back the dates if he had any doubts about Southern's ability to keep on schedule. During these negotiations, George never insisted on receiving the vessels by a certain date; all proposed delivery dates came from Southern. Colby, Frierson, and Crow testified Seligman was asked to check with his suppliers to ascertain the availability of materials before fixing the delivery dates and Seligman promised to do so. Crow testified that at the September 19th meeting Seligman stated he had checked with suppliers before determining the delivery dates which were incorporated into the Amendment, and he again assured Frierson and Crow he could meet the delivery dates.
Southern's representatives had a very different recollection of the two days of negotiations preceding the execution of the Amendment. Seligman and Juan Del Real, attorney for Southern, testified Seligman was never asked to check with his suppliers before fixing the delivery dates and he made no representations he had consulted *1043 them. Seligman pointed out that since the September 18th meeting ended after 5:00 P.M. and he proposed the final delivery dates early the next morning, it would have been impossible for him to check with his many suppliers. (Crow, counsel for George, testified he wondered how Seligman had the time to contact his vendors prior to the September 19th meeting.) Seligman explained that he based the delivery dates on the status of construction, the number of manhours needed for completion, and the availability of labor. He said he did not consider possible delays in procurement.
The agreement which was executed on September 19, 1974, provided a $400,000 total payment to Southern in addition to the original sums specified for the five vessels. It was termed a "performance bonus." Each party agreed to release the other from all existing claims and to submit future claims to arbitration. Liquidated damages, due on failure to deliver timely, were greatly increased above those provided for in the five original contracts. The new delivery dates were subject to extension upon the happening of any one of several contingencies. The agreement provided for an extension if construction was delayed by arbitration or by changes in the plans and specifications. Additionally, delays caused by a force majeure would extend the delivery dates. "Force majeure" was defined in the contract as including "all causes whatsoever beyond the control of [Southern]." The definition also had an illustrative list which included the following: "delays of delivery of material which [Southern], by reasonable precaution, cannot avoid." Finally, the agreement provided an automatic grace period of forty-five days for delivery of the vessels.
Immediately after the execution of the Amendment, Southern began to encounter problems in procuring certain equipment. George argues that Southern was fully aware of these problems on September 19 and intentionally concealed them.
On September 20, 1974, Seligman called George requesting help in securing prompt delivery of mud tanks for Hull 108 from TBW Industries, Inc. (TBW). On September 24, Seligman gave written notice, as required in the Amendment, that the lack of mud tanks might cause a delay. George contacted TBW and was told the mud tanks had been taken out of construction due to a credit problem with Southern. Seligman testified Southern's financial account with TBW was current and he knew nothing about the interruption in construction of the tanks until informed of it by George on September 30, 1974. Documentary evidence was introduced by Southern to show all TBW invoices had been paid timely. However, Al Gonsoulin, sales manager for TBW, testified that in June 1974 he told both Southern and George the tanks were being taken out of production. George, through Frierson, denied Gonsoulin disclosed this information to it in June 1974.
Additionally, a problem developed in securing forgings. The supplier, Kropp Forge Company of Chicago, was struck by its employees on August 28, 1974. The strike was not resolved until November 1974. Southern maintains it did not find out about the strike until September 30. Testimonial and documentary evidence was offered by Southern tending to prove this contention. In contrast, Erling Rabe, who was the local representative of Kropp Forge in Louisiana, testified he promptly informed Southern and his other customers of the strike. However, Mr. Rabe conceded on cross-examination he did not remember specific dates and he was less than positive in other respects.
Despite delays, the five vessels were completed and delivered, although not by the designated delivery dates. On each delivery, George paid the escalation or performance bonus agreed to in the Amendment.
The Civil Code discusses the doctrine of principal cause in the following articles:
Art. 1823. Errors may exist as to all the circumstances and facts which relate to a contract, but it is not every error that will invalidate it. To have that effect, the error must be in some point, which was a principal cause for making the contract, and it may be either as to the *1044 motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself.
Art. 1824. The reality of the cause is a kind of precedent condition to the contract, without which the consent would not have been given, because the motive being that which determines the will, if there be no such cause where one was supposed to exist, or if it be falsely represented, there can be no valid consent.
Art. 1825. The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the motive, and means that consideration without which the contract would not have been made.
Art. 1826. No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it.
Art. 1827. But wherever the motive is apparent, although not made an express condition, if the error bears on that motive, the contract is void. A promise to give a certain sum to bear the expenses of a marriage, which the party supposes to have taken place, is not obligatory, if there be no marriage.
George asserts the trial court erred in holding the principal cause had to be an expressed condition in a written contract and in stating the principal cause must be the sole cause of the contract. We acknowledge that these are erroneous principles (C.C. arts. 1825, 1827); however we do not find these errors in the trial court's opinion. In its oral reasons for judgment, the trial court referred to the written terms of the Amendment as a source of reference to determine the motive of the parties. There was no holding that the principal cause had to be in writing. On the second point, although the lower court did state that firm delivery dates were not the sole cause of the contract, it went on to find that neither were they the principal cause. The court made no express nor implied ruling that the principal cause of a contract must be the sole cause.
We agree with the trial court that the failure to express in the written contract that the delivery dates were to be based on information from material suppliers is a factor which mitigates against George's claim. The parties, both represented by astute businessmen and advised by counsel, were negotiating at arm's length. According to George, the background for these negotiations was a recent lawsuit, a threat by Southern to breach the construction contracts, economic coercion, a long series of broken verbal commitments, and endless delays ascribed to procurement problems. Under such circumstances, one would expect George to distrust verbal assurances and put into writing all significant conditions of the contract. Instead, the delivery dates are set forth in the Amendment in a manner not unlike that used for the unrealistic, illusory dates in the original contracts.
Most significantly, the force majeure clause, adopted by reference from the original contracts, expressly excuses delays caused by late delivery of materials. No exception was made for impediments to delivery existing on September 19, 1974. We find this incompatible with George's claim that its primary motive was to secure firm delivery dates based on assurances that suppliers would not impede timely delivery.
We are convinced George was concerned about delays caused by procurement difficulties. These problems had long plagued the construction of the five vessels. However, we conclude, as did the trial court, that George has failed to prove by a preponderance of the evidence that its principal motive in executing the Amendment was to secure firm, fixed delivery dates based upon assurances from suppliers that materials would be available. From the terms of the contract and the surrounding circumstances, we determine the principal cause was to get work in progress and have a good faith commitment from Southern to comply with its contractual obligations. George had to show its customers and lenders that construction would go forward.
*1045 The alternative to a new agreement with Southern was a lawsuit, which would not have satisfied George's financiers and purchasers.
Since we conclude that firm delivery dates predicated upon the absence of supply problems were not the principal cause of the contract, it is not necessary to rule on whether there were misrepresentations concerning the delivery dates which constituted error. Error that does not go to the principal cause is not sufficient for rescinding a contract. C.C. art. 1825.
Even if our independent determinations were otherwise, the applicable standard of fact review precludes us from disturbing the findings of the trial court upon which its decision was premised. A careful review of the entire record convinces us the trial court did not commit manifest error in finding George failed to prove, by a preponderance of the evidence, it was entitled to rescission due to misrepresentations constituting error in the principal cause. The context of this case does not permit us to substitute our version of the facts for that of the trial court. Indeed, the conflicting evidence adduced required an assessment of credibility of the witnesses by the trial judge, and his derivative factual conclusions must, therefore, be accorded great weight. Canter v. Koehring Company, 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are to be paid by plaintiff-appellant.
AFFIRMED.