# IN THE SUPREME COURT OF IOWA

No. 18–1199

Filed January 10, 2020

**ROY KARON** and **PEDDLER LLC,**

Appellants,

vs.

**ELLIOTT AVIATION, JAMES MITCHELL, WYNN ELLIOTT, ELLIOTT AVIATION AIRCRAFT SALES, INC.,** and **ELLIOTT JETS,**

Appellees.

---

Appeal from the Iowa District Court for Polk County, David N. May, Judge.

The plaintiffs appeal a district court order dismissing their claims without prejudice based on a forum-selection clause. **AFFIRMED.**

Steven J. Crowley and Edward J. Prill of Crowley & Prill Law Firm, Burlington, for appellants.

William W. Graham and Wesley T. Graham of Duncan Green, P.C., Des Moines, and Patrick J. Rooney and Tyler P. Brimmer of Fafinski Mark & Johnson, P.A., Eden Prairie, Minnesota, for appellees.

2

**MANSFIELD, Justice.**

**I. Introduction.**

This case, involving an alleged scheme to inflate the purchase price of a general aviation jet aircraft, presents the question of what must be shown to avoid the effects of a contractual forum-selection clause. Is fraud *in general* enough, or does the fraud have to relate *specifically* to the clause? Joining the Restatement (Second) of Conflict of Laws, the United States Supreme Court, and a number of our fellow state supreme courts, we conclude that the fraud must relate to the clause itself. This is a logical corollary to our prior holding that the fraud necessary to set aside an agreement to arbitrate must relate to the arbitration clause itself. *See Dacres v. John Deere Ins.*, 548 N.W.2d 576, 578 (Iowa 1996).

In the present case, the plaintiffs contend that the defendants cheated them, but they have not alleged fraud with respect to the forum-selection clause in the written contract. Accordingly, we affirm the district court's order dismissing this action without prejudice and requiring any future action to be brought in Kansas.

**II. Facts and Procedural History.**

Because we are reviewing the grant of a motion to dismiss, we take as true the plaintiffs' factual allegations. *See Venckus v. City of Iowa City*, 930 N.W.2d 792, 798 (Iowa 2019).

**A. The Parties Involved.** Roy Karon is an Iowa resident and the sole member of Peddler, LLC, an Iowa limited liability company. Karon is also the sole shareholder of BVS, Inc., a nonparty Iowa corporation based in Cedar Rapids. Peddler leases an aircraft to BVS and Karon so their personnel can travel the United States and Canada to provide training to financial institutions.

Wynn Elliott is the president and a director of Elliott Aviation Aircraft Sales, Inc., an Iowa corporation, and the president and a director of Elliott Aviation, Inc., an Iowa corporation. At all relevant times, James Mitchell was an aircraft sales manager at Elliott Aviation Aircraft Sales, Inc. The parties have collectively referred to Wynn Elliott, James Mitchell, Elliott Aviation Aircraft Sales, and Elliott Aviation as "the Elliott Defendants."

**B. The Cessna Citation X Agreement.** In April 2014, Karon was looking to upgrade Peddler's 1999 Cessna Citation Bravo jet aircraft to a Cessna Citation X, a larger, faster jet. Karon wanted Peddler to sell the Bravo and purchase a Citation X in a tax-free exchange pursuant to § 1031 of the Internal Revenue Code. *See* 26 U.S.C. § 1031 (2012).[1]

Karon had been doing business with the Elliott Defendants for over thirty years, and he decided to use their services in purchasing the Citation X. Thus Karon proposed to Mitchell, who was acting on behalf of the Elliott Defendants, that (1) Karon would search for and find a Citation X suitable for Peddler's needs, (2) Karon would negotiate a price with the Citation X seller on the behalf of Peddler, (3) Karon would notify the Elliott Defendants, and (4) the Elliott Defendants would act as the broker to accomplish the § 1031 exchange. In the brokered transaction, the Elliott Defendants would acquire the chosen Citation X from the seller for Peddler, and then Peddler would trade in the Bravo to the Elliott Defendants for an agreed-upon $1.8 million, pay the remaining cash balance due, and immediately accept delivery of the Citation X. The Elliott Defendants would be compensated through a transaction fee of $100,000 plus whatever profit they received on the lease or resale of the Bravo.

[1]If Peddler did not use a § 1031 exchange, it would presumably be liable for income tax on recaptured depreciation when it sold the Bravo.

Mitchell, on the behalf of the Elliott Defendants, orally accepted Karon's proposal.

Although Karon was to be responsible for finding the Citation X, both Mitchell and Karon researched the aircraft market and found a used 2000 Citation X that would suit Peddler's needs. The Citation X was being sold by Kansas-headquartered Cessna Aircraft Company, a company for which Mitchell used to work. When Karon contacted Mitchell to inform him that he would begin price negotiations with Cessna, Mitchell offered to negotiate the price himself. Mitchell represented that he (Mitchell) would be able to negotiate a lower price because of his prior relationship with Cessna. Karon agreed.

Karon alleges that Mitchell informed him Cessna wanted $6 million for the Citation X. Karon responded to Mitchell that he would pay no more than $5.8 million. The negotiations continued.

Mitchell and Cessna arrived at a final acquisition price, which Mitchell told Karon was $5.8 million. Karon accepted this price, and the parties then negotiated additional details, including the installation of winglets to increase the plane's range and capacity, pilot training, and subscriptions to certain service programs. A written purchase agreement (Purchase Agreement) was drawn up between the parties based upon the $5.8 million aircraft acquisition price. The brokerage fee, winglets, pilot training, and service program subscriptions brought the total contract value to approximately $6.7 million. Karon signed the Purchase Agreement on behalf of Peddler on May 30, and Mitchell signed on behalf of Elliott Aviation Aircraft Sales on June 2. Approximately three weeks later, on June 26, the Citation X was transferred from Cessna to Elliott Aviation Aircraft Sales and then immediately to Peddler. At that time, Peddler paid the Elliott Defendants the $100,000 brokerage fee.

The Purchase Agreement contained the following paragraph:[2]

> 9. CHOICE OF LAW AND JURISDICTION. [Elliott Aviation Aircraft Sales] and [Peddler] agree this Agreement will be deemed made and entered into and will be performed wholly within the State of Kansas, and any dispute arising under, out of, or related in any way to this Agreement, the legal relationship between [Elliott Aviation Aircraft Sales] and [Peddler], or the transaction that is the subject of this Agreement will be governed and construed under the laws of the State of Kansas, USA, exclusive of conflicts of laws. Any dispute arising under, out of, or related in any way to this Agreement, the legal relationship between [Elliott Aviation Aircraft Sales] and [Peddler] or the transaction that is the subject of this Agreement will be adjudicated solely and exclusively in the United States District Court for the State of Kansas, in Wichita, Kansas, or, if that court lacks jurisdiction, Kansas state courts of the 18th Judicial District. Each of the parties consents to the exclusive, personal jurisdiction of these courts and, by signing this Agreement, waives any objection to venue of the Kansas courts.

The Purchase Agreement also had a "severability and waiver" clause:

> If any provision of this Agreement is or becomes null or unenforceable by operation of law, the other provisions will remain valid and enforceable. The waiver by either party of a breach of any provision of this Agreement will not constitute a waiver of any subsequent breach of the same or any other provision nor will it be considered a waiver of the provision itself.

Furthermore, the Purchase Agreement contained an integration clause: "This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior written or oral agreements, representations, negotiations, proposals or discussions between the parties with respect to its subject matter."

**C. The Litigation.** In February 2015, "an outside source" informed Karon that the actual acquisition price for the Citation X was

---

[2]The plaintiffs' petition referred to "written documents" that documented "the final transaction," although their petition did not attach those documents. Instead, the defendants supplied the Purchase Agreement as an exhibit to their motion to dismiss. The plaintiffs do not dispute that this exhibit is in fact the parties' written Purchase Agreement.

likely far less than $5.8 million. Accordingly, Karon contacted the Elliott Defendants and requested documentation of the acquisition price. Peddler and Karon allege they ultimately discovered "via a separate and independent source" that the acquisition price was indeed misrepresented, and they demanded reimbursement of the $400,000 difference between $5.8 million and the actual $5.4 million acquisition price. The Elliott Defendants refused. This litigation followed.

On February 26, Peddler filed suit against Elliott Aviation Aircraft Sales in the Iowa District Court for Linn County. Fact discovery took place. The defendant filed a motion for summary judgment which, on April 7, 2016, the district court denied.[3] A jury trial was scheduled for January 9, 2017. On December 29, 2016—eleven days prior to the scheduled commencement of trial in Linn County—Peddler voluntarily dismissed its petition without prejudice pursuant to Iowa Rule of Civil Procedure 1.943.

Over a year later, on February 23, 2018, Peddler, this time joining with Karon, refiled its action in the Iowa District Court for Polk County against all the Elliott Defendants. The petition alleged that the Elliott Defendants had breached their oral brokerage contract with Peddler; the Elliott Defendants had fraudulently misrepresented the acquisition price of the Citation X and failed to disclose the true acquisition price; and Mitchell, acting individually and as an agent of the Elliott Defendants, had breached a fiduciary duty to Peddler by misrepresenting the acquisition price.

The Elliott Defendants, in lieu of filing an answer, moved to dismiss on three grounds. First, the Elliott Defendants maintained the claims were barred by the applicable Kansas statutes of limitations. Second, the Elliott

---

[3]That motion went to the merits of the litigation. Elliott Aviation Aircraft Sales did not raise the forum-selection clause in the initial litigation.

Defendants asserted improper venue based on the forum-selection clause in the Purchase Agreement. Third, the Elliott Defendants urged that the petition failed to allege a cause of action against Wynn Elliott or Elliott Aviation, Inc. Peddler and Karon resisted, and a hearing was held on June 7.

On June 13, the district court issued an order dismissing the case without prejudice based on improper venue:

> Defendants ask this Court to enforce Paragraph 9. Specifically, Defendants ask this Court to: (1.) dismiss with prejudice because, *inter alia*, Plaintiffs' claims are barred by the applicable Kansas statutes of limitation; or, in the alternative, (2.) dismiss without prejudice because Kansas, not Iowa, is the parties' chosen venue.
>
> Plaintiffs respond that, because they have alleged that the purchase agreement was "procured by fraud" and is "void ab initio," the Court cannot enforce Paragraph 9 of the purchase agreement. Plaintiffs emphasize that, because the purchase agreement is not "fully integrated," their claims of fraudulent inducement are not precluded.
>
> Importantly, though, Plaintiffs' fraud claims are about the transaction as a whole, through which they were allegedly "defrauded out of $400,000." Plaintiffs make no claim that *Paragraph 9* was induced by fraud. Nor do Plaintiffs claim that Paragraph 9 *itself* is otherwise invalid.
>
> Thus, the problem before the Court is similar to one that sometimes arises in the context of arbitration: If a contract contains an arbitration clause, and if the plaintiff claims that *the entire contract* was fraudulently induced, should the arbitration clause be enforced?
>
> In *Prima Paint*, the United States Supreme Court held that if the plaintiff's allegations of fraud are directed to *the total transaction*, and not to the arbitration clause *itself*, then the arbitration clause should be enforced. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967). Arbitrators, not judges, should resolve allegations of fraud in the transaction "as a whole." *See Madol v. Dan Nelson Auto. Grp.*, 372 F.3d 997, 1000 (8th Cir. 2004) (applying *Prima Paint*).
>
> Iowa has adopted the *Prima Paint* rule. [The court went on to quote from *Dacres*, 548 N.W.2d at 578].

Of course, Paragraph 9 is not an arbitration clause. Instead, it contains venue and choice of law provisions. Courts have held, however, that the *Prima Paint* rule applies with equal force to venue and choice of law provisions. *See, e.g., Stamm v. Barclays Bank of N.Y.*, 960 F. Supp. 724, 729 (S.D.N.Y. 1997) (citing *Prima Paint* and other authorities for the proposition that a "claim of fraud in the inducement of a contract is insufficient to invalidate a forum selection or choice-of-law clause found in that contract"). As Magistrate Judge Walters correctly observed, venue and choice of law provisions "would be practically unenforceable if they could be avoided simply by an allegation of fraud in the inducement." *Morris v. McFarland Clinic P.C.*, No. CIV. 4:03-CV-30439, 2004 WL 306110, at *2 (S.D. Iowa Jan. 29, 2004).

The Court concludes, therefore, that the *Prima Paint* rule should be used to determine whether Paragraph 9 is enforceable. *See Dacres*, 548 N.W.2d at 578. As already explained, Plaintiffs' claims of fraud are about *the transaction as a whole*. Plaintiffs do not claim that Paragraph 9 *itself* was fraudulently induced. Therefore, under the *Prima Paint* rule, Paragraph 9 should be enforced.

Karon and Peddler filed a timely appeal, which we retained.

**III. Standard of Review.**

We review rulings on motions to dismiss for correction of errors at law. *Venckus*, 930 N.W.2d at 798.

**IV. Does the *Prima Paint* Rule Apply in Iowa to Forum-Selection Clauses?**

Under paragraph 9 of the Purchase Agreement, there is no dispute that the plaintiffs' claims "aris[e] under, out of, or [are] related . . . to" the agreement between Elliott Aviation Aircraft Sales and Peddler or "the transaction that is the subject of" that agreement. Therefore, taking paragraph 9 at its terms, exclusive jurisdiction and venue for this case should rest in the federal and state courts located in Wichita, Kansas.[4] The plaintiffs, however, argue that their allegation of fraud changes things.

---

[4]The plaintiffs make no attempt to distinguish between parties that signed the Purchase Agreement (i.e., Peddler and Elliott Aviation Aircraft Sales) and those that did not.

The district court in this case applied the rule provided by the United States Supreme Court for arbitration clauses in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 87 S. Ct. 1801 (1967). Prima Paint purchased the assets of Flood & Conklin's paint business. *Id.* at 397, 87 S. Ct. at 1802. After Prima Paint failed to make the first payment due under the agreement, Flood & Conklin served a notice to arbitrate. *Id.* at 398, 87 S. Ct. at 1803. Prima Paint filed suit seeking rescission of the entire agreement on the basis of fraud. *Id.* Flood & Conklin moved to stay the court action pending arbitration, contending that whether there was fraud in the inducement of the consulting agreement was a question for the arbitrators. *Id.* at 399, 87 S. Ct. at 1803. The district court granted Flood & Conklin's motion, and the court of appeals affirmed. *Id.* at 399, 87 S. Ct. at 1803–04.

The Supreme Court also affirmed. *Id.* at 406–07, 87 S. Ct. at 1807. It held that under the Federal Arbitration Act (FAA), a claim of fraud in the inducement of the entire contract did not vitiate an arbitration clause referring any controversy or claim arising out of or relating to the agreement to arbitration:

> Accordingly, if the claim is fraud in the inducement of arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403–04, 87 S. Ct. at 1806 (footnote omitted).

Our court followed the *Prima Paint* rule in *Dacres*, 548 N.W.2d 576. Dacres brought an action against his employer to recover damages for breach of contract and fraud. *Id.* at 577. The employer invoked an arbitration clause in the parties' contract. *Id.* Over Dacres's opposition, the district court ordered that the action for damages be stayed and that

the dispute be settled by arbitration. *Id.* The arbitration panel found against Dacres. *Id.* at 577–78. On appeal, Dacres argued that the arbitration clause should not have been enforced because (among other things) it had been procured by fraud. *Id.* at 578. We held that because Dacres's allegations of fraud in the inducement went to the entire agreement rather than specifically to the arbitration clause, it was appropriate for the arbitration panel rather than the district court to resolve the merits of the dispute:

> [I]f a claim of fraud in the inducement is aimed at the entire contract and that contract includes an agreement for arbitration of disputes with respect thereto, the fraud claim is properly to be determined by the arbitrators. Only if the fraud in the inducement claim is specifically directed at the arbitration clause itself is it subject to litigation in a court. . . . Because Dacres'[s] allegations of fraud in the inducement go to the entire agreement, they were properly determined by the arbitrators.

*Id.* (citation omitted).

The question then is whether *Prima Paint* applies to a forum-selection clause. In *Scherk v. Alberto-Culver Co.*, the Supreme Court held that it did as a matter of federal law. 417 U.S. 506, 519–20, 94 S. Ct. 2449, 2457 (1974). Scherk, a German citizen, sold his trademarks and interest in a European toiletries business to Alberto-Culver, a Delaware corporation with its principal place of business in Illinois. *Id.* at 508, 94 S. Ct. at 2451–52. The contract called for the arbitration of disputes in France with the application of Illinois law. *Id.* at 508, 94 S. Ct. at 2452. After differences between the parties arose, Alberto-Culver filed suit in the United States District Court for the Northern District of Illinois, and Scherk moved to dismiss for lack of jurisdiction based on the forum-selection clause. *Id.* at 509, 94 S. Ct. at 2452. The district court denied

the motion, and the court of appeals affirmed the denial. *Id.* at 510, 94 S. Ct. at 2452–53.

The Supreme Court reversed, concluding that the forum-selection clause should control. *Id.* at 519–21, 94 S. Ct. at 2457–58. The Court noted, "An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Id.* at 519, 94 S. Ct. at 2457.

The Court further noted,

> In *The Bremen* we noted that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud . . . ." 407 U.S., at 13, 12, 92 S. Ct., at 1915, 1914. This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this cause, the clause is unenforceable. Rather it means that an arbitration *or forum-selection clause* in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion. *Cf. Prima Paint Corp.*, 388 U.S. 395, 87 S. Ct. 1801.

*Id.* at 519 n.14, 94 S. Ct. at 2457 n.14 (emphasis added); *see M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S. Ct. 1907, 1916 (1972) ("The correct approach would have been to enforce the forum clause specifically unless Zapata could clearly show that enforcement would be unreasonable or unjust, or that the *clause* was invalid for such reasons as fraud or overreaching." (Emphasis added.)).

*Scherk* and *M/S Bremen* were decided under federal law. Unlike in the arbitration context, where the FAA applies, there is no federal legislation that governs state court proceedings when a forum-selection clause is at issue. *Cf. Stewart Org., Inc.*, 487 U.S. at 28–29, 108 S. Ct. at 2243 (holding that 28 U.S.C. § 1404(a) governs the enforceability of a forum-selection clause in a diversity case in federal court). Accordingly,

enforcement of a forum-selection clause in state court is a matter of state law. *See Perkins v. CCH Computax, Inc.*, 415 S.E.2d 755, 757 (N.C. Ct. App. 1992) (declining to apply federal law), *rev'd*, 423 S.E.2d 780, 781 (N.C. 1992), *superseded in part by statute*, 1993 N.C. Sess. Laws ch. 436

Nonetheless, a number of state appellate courts have followed the United States Supreme Court's lead in ruling that forum-selection clauses are enforceable unless the fraud goes specifically to the clause. *See, e.g.*, *Ex parte PT Sols. Holdings, LLC*, 225 So. 3d 37, 45 (Ala. 2016) ("White has never contended that the forum-selection clause itself is invalid as the result of fraud, undue influence, or overweening bargaining power. Instead, she challenged the validity of the contract as a whole based on when she executed it. White is certainly entitled to argue that the contract never became effective, but the argument must be raised in the forum dictated by the forum-selection clause because the possible invalidity of the contract as a whole does not negate enforcement of the forum-selection clause."); *Bennett v. Appaloosa Horse Club*, 35 P.3d 426, 431–32 (Ariz. Ct. App. 2001) (holding that the forum-selection clause requiring litigation in Idaho applied to the plaintiff's fraud and consumer fraud claims); *Provence v. Nat'l Carriers, Inc.*, 360 S.W.3d 725, 730 (Ark. 2010) ("[W]e hold that in Arkansas a party like the appellants in the instant case must plead fraud in the inducement of the forum-selection clause itself to avoid its application. Generalized allegations of fraud with respect to the inducement of the contract as a whole, as the appellants have made in the instant case, will not operate to invalidate a forum-selection clause."); *Edge Telecom, Inc. v. Sterling Bank*, 143 P.3d 1155, 1162 (Colo. App. 2006) ("We agree with the rationale . . . and similarly hold that so long as a forum selection clause is itself not the result of fraud, the parties can fairly expect to litigate any issues, including the plaintiff's general allegations of fraud,

in the designated forum."); *Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 380 (Del. 2013) ("[A] party cannot make 'an end-run around an otherwise enforceable [f]orum [s]election [p]rovision through an argument about the enforceability of other terms in the contract' . . . ." (alterations in original) (quoting *Ashall Homes Ltd. v. ROK Entm't Grp., Inc.*, 992 A.2d 1239, 1248 (Del. Ch. 2010))); *Golden Palm Hosp., Inc. v. Stearns Bank Nat'l Ass'n*, 874 So. 2d 1231, 1235 (Fla. Dist. Ct. App. 2004) ("When it claims that a forum selection clause is invalid based on fraud, the party must show that the clause itself is the product of the fraud or that the fraud caused the inclusion of the clause in the agreement."); *Brandt v. MillerCoors, LLC*, 993 N.E.2d 116, 122 (Ill. App. Ct. 2013) ("[I]n order to invalidate the clause on the ground of fraud and overreaching, the fraud alleged must be specific to the forum selection clause itself." (quoting *IFC Credit Corp. v. Rieker Shoe Corp.*, 881 N.E.2d 382, 395 (Ill. App. Ct. 2007))); *Vanier v. Ponsoldt*, 833 P.2d 949, 952 (Kan. 1992) ("Parties to a contract may choose the jurisdiction in which all actions or proceedings arising from their transaction shall be heard. The forum selected by the parties must bear a reasonable relationship to the transaction and the forum-selection clause in the contract must not have been entered into under fraud or duress." (syllabus by the court)); *Vallejo Enter., L.L.C. v. Boulder Image, Inc.*, 950 So. 2d 832, 835 (La. Ct. App. 2006) ("For the forum-selection clause to be unenforceable on the grounds of fraud or overreaching, it must be shown that the inclusion of the clause in the contract was the product of fraud or coercion."); *Karty v. Mid–Am. Energy, Inc.*, 903 N.E.2d 1131, 1135 (Mass. App. Ct. 2009) ("[B]ecause the allegations set out in Karty's complaint and amended complaint speak only to fraud in the inducement as to the entire subscription agreement and fail to allege or set out any facts concerning the specific question whether

the forum-selection clause was obtained by fraud, we see no error in the dismissal of his complaint."); *Paradise Enters. Ltd. v. Sapir*, 811 A.2d 516, 521 (N.J. Super. Ct. App. Div. 2002) ("[G]enerally [forum-selection clauses] are 'prima facie valid and enforceable in New Jersey[,]' and . . . 'New Jersey courts will decline to enforce a clause only if it fits into one of three exceptions to the general rule: (1) the clause is a result of fraud or "overweening" bargaining power; (2) enforcement would violate the strong public policy of New Jersey; or (3) enforcement would seriously inconvenience trial.' . . . *Bremen* 'represents the prevailing view on the enforceability of forum-selection clauses, and has been applied by federal and state courts confronted by jurisdictional choices involving forum-selection clauses.' General acceptance of the validity of forum selection agreements principles is corroborated by the *Restatement (Second) of Conflict of Laws . . . .*" (first quoting *Caspi v. Microsoft Network, L.L.C.*, 732 A.2d 528, 530 (N.J. Super. Ct. App. Div. 1999); and then quoting *Kubis v. Perszyk Assocs., Inc. v. Sun Microsystems, Inc.*, 680 A.2d 618, 624 (N.J. 1996))); *Original Pizza Pan v. CWC Sports Grp., Inc.*, 954 N.E.2d 1220, 1223 (Ohio Ct. App. 2011) ("It is settled law that unless there is a showing that the alleged fraud or misrepresentation induced the party opposing a forum selection clause to agree to inclusion of that clause in the contract, a general claim of fraud or misrepresentation as to the entire contract does not affect the validity of the forum selection clause. Thus even if plaintiffs were induced to enter into the agreement by fraud, deceit and misrepresentation, this would not affect the validity of the forum selection clause." (Citation omitted.) (quoting *Four Seasons Enters. v. Tommel Fin. Servs., Inc.*, No. 77248, 2000 WL 1679456, at *2 (Ohio Ct. App. Nov. 9, 2000)); *Patriot Commercial Leasing Co. v. Kremer Rest. Enters., LLC*, 915 A.2d 647, 653 (Pa. Super. Ct. 2006) ("A forum selection clause can be

avoided for fraud only when the fraud relates to procurement of the forum selection clause itself, standing independently from the remainder of the agreement."); *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008) ("We have held that fraudulent inducement to sign an agreement containing a dispute resolution agreement such as an arbitration clause or forum-selection clause will not bar enforcement of the clause unless the specific clause was the product of fraud or coercion."); *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 807 (Va. 1990) ("According to the modern view, which we now embrace, contractual provisions limiting the place or court where potential actions between the parties may be brought are prima facie valid and should be enforced, unless the party challenging enforcement establishes that such provisions are unfair or unreasonable, or are affected by fraud or unequal bargaining power."); *Caperton v. A.T. Massey Coal Co.*, 690 S.E.2d 322, 348 (W. Va. 2009) (adopting the federal approach and stating that the party challenging the contractually chosen forum must show "that the clause was invalid for such reasons as fraud or overreaching"); *Durdahl v. Nat'l Safety Assocs., Inc.*, 988 P.2d 525, 528 (Wyo. 1999) ("We adopt the modern approach and hold forum selection clauses are *prima facie* valid and will be enforced absent a demonstration by the party opposing enforcement that the clause is unreasonable or based upon fraud or unequal bargaining positions.").

A handful of state courts, such as the Utah Supreme Court, take a minority approach that allows a plaintiff's claim that the contract as a whole was entered into fraudulently to potentially render the forum-selection clause unenforceable. *See, e.g.*, *Energy Claims Ltd. v. Catalyst Inv. Grp. Ltd.*, 325 P.3d 70, 83 (Utah 2014). In *Energy Claims*, the Utah Supreme Court reasoned,

The major flaw with the majority approach is that the district court must accept as valid a provision in a contract despite the plaintiff's contention that the entire contract was induced by fraud. We also find it problematic that the majority approach imposes upon the plaintiff the burden of making a "separate and distinct challenge" to the forum selection clause itself, when the only support the plaintiff has—the allegation that the entire contract and all of the provisions contained therein are fraudulent—is deemed to be necessarily inadequate. The application of this approach may also result in defrauded plaintiffs being forced to litigate a contract that is ultimately deemed fraudulent in a different forum as the result of a provision they never bargained for.

We recognize, however, that the majority approach does have the effect of avoiding the task of determining whether a contract is valid at the motion to dismiss stage. Instead, it reserves that issue until further discovery can be done, at which point that issue can be adjudicated on its merits with the benefit of full discovery. This notwithstanding, we conclude that the minority approach is more consistent with our case law and with the standard of review employed at the motion to dismiss stage. We are also not persuaded that the minority approach will allow plaintiffs to freely dodge forum selection clauses, since (a) they are required to plead fraud with particularity, and (b) the district court has the discretion to order an evidentiary hearing, both of which will assure that valid forum selection clauses are not rejected based on the pleadings alone.

*Id.* at 85–86 (footnote omitted). In the court's view, this minority approach "protects defrauded plaintiffs from being forced to litigate fraudulent contracts in a potentially inconvenient forum not of their choosing." *Id.* at 85. This Utah precedent has not been followed by the courts of any other state since its issuance.

Notably, the effect of the forum-selection clause in *Energy Claims* would have been to move the litigation to England, not to a nearby state as here. *See id.* at 75, 80. Also, the Utah court emphasized that Utah Rule of Civil Procedure 9(b) requires fraud to be pled with particularity. *Id.* at 86. Thus, in Utah, a plaintiff is "required to plead with particularity the circumstances leading to the fraudulent inducement of the contract." *Id.* The court noted,

> This rule provides protection against the possibility that plaintiffs could avoid forum selection clauses by artfully pleading around them, as the trial judge can review the complaint to ensure that the details provided by the plaintiff truly constitute fraudulent inducement of the contract.

*Id.* No comparable provision exists in Iowa; our rules contain no counterpart to Federal Rule of Civil Procedure 9(b) and thus do not expressly require fraud to be pled with particularity. *See* Rosenberg *v. Miss. Valley Constr. Co.*, 252 Iowa 483, 485, 106 N.W.2d 78, 79 (1960) ("[I]t is not necessary that all details and circumstances of the transaction be set forth with particularity [with allegations of fraud]; it is sufficient if the allegation of fraud is explicitly and distinctly made and the mode in which the fraud was accomplished is pointed out."); *see also* Iowa R. Civ. P. 1.402(2)(*a*) ("Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleadings are required.").

The Utah court cited three other state jurisdictions for following the minority approach: Georgia, New York, and Tennessee. *Energy Claims*, 325 P.3d at 85 & n.82; *see SRH, Inc. v. IFC Credit Corp.*, 619 S.E.2d 744, 746 (Ga. Ct. App. 2005); *DeSola Grp., Inc. v. Coors Brewing Co.*, 605 N.Y.S.2d 83, 83–84 (App. Div. 1993); *Lamb v. Megaflight, Inc.*, 26 S.W.3d 627, 631 (Tenn. Ct. App. 2000).[5] It also suggested that Missouri might be leaning toward adopting the minority approach. *Energy Claims*, 325 P.3d at 85 n.81; *see Burke v. Goodman*, 114 S.W.3d 276, 280 (Mo. Ct. App. 2003) (analyzing enforcement of a forum-selection clause by first determining whether or not the contract was adhesive, stating that "the forum selection clause must have been obtained through freely negotiated agreements absent fraud and overreaching").

---

[5] *See also Johnson v. Key Equip. Fin.*, 627 S.E.2d 740, 742 (S.C. 2006) (holding that a forum-selection clause opting for New York courts did not prevent the plaintiffs from suing in South Carolina over misrepresentations that predated the parties' agreement).

We question the Utah Supreme Court's inclusion of New York. A widely available treatise on New York law states, "To invalidate a forum selection clause on [fraud or overreaching], however, the allegation of fraud or overreaching must go, not to the contract as a whole, but to the clause itself." 2 Robert I. Steiner, *New York Practice Series: Commercial Litigation in New York State Courts* § 13:15 (Robert L. Haig ed., 4th ed.), Westlaw (database updated Sept. 2019) (citing *Hunt v. Landers*, 766 N.Y.S.2d 384, 385 (App. Div. 2003); *Hirschman v. Nat'l Textbook Co.*, 584 N.Y.S.2d 199, 200 (App. Div. 1992); *British W. Indies Guar. Tr. Co. v. Banque Internationale a Luxembourg*, 567 N.Y.S.2d 731, 732 (App. Div. 1991)); *see also Wang v. UBS AG*, 29 N.Y.S.3d 185, 185 (App. Div. 2016) ("The forum selection clause applies to the fraud claims, as they arise out of and in connection with the parties' account agreement . . . ."); Patricia Youngblood Reyhan, *Choice of What? The New York Court of Appeals Defines the Parameters of Choice-of-Law Clauses in Multijurisdictional Cases*, 82 Alb. L. Rev. 1241, 1254–55 (2019) ("New York courts presume their validity, overcoming that presumption only in cases where general contract principles, such as fraud, duress, overreaching or unconscionability, or damage to a fundamental public policy would undermine the clause. Even as to these grounds, they must go to the forum selection clause itself and not to the contract as a whole." (Footnote omitted.)).

Furthermore, the Utah court's supposition that Missouri might have been leaning toward the minority approach has not come to fruition. In 2014, the Missouri Court of Appeals considered Arkansas and then Missouri law in succession, finding that both led to the same outcome. Like Missouri, Arkansas enforces forum-selection clauses unless it is shown that to do so "would be unreasonable and unfair." *Provence*, 360

S.W.3d at 729.  The Arkansas Supreme Court in *Provence* considered, as in this case, "the validity of forum-selection clauses where fraud is generally pled as inducing the agreements."  *Id.*  The Missouri Court in *Raydiant Technology, LLC v. Fly-N-Hog Media Group, Inc.* followed the lead of Arkansas, stating,

> Raydiant claims fraud in the inducement of the contract as a whole, not solely as to its forum selection clause, which is insufficient per *Provence*.  Because Raydiant does not otherwise show unfairness or unreasonableness, we find no basis to reverse under Arkansas law.

> Missouri law yields the same result.  Raydiant's contention that these contract provisions do not reach a tort claim of fraud either overlooks or misreads our opinion in *Major* [*v. McCallister*, 302 S.W.3d 227 (Mo. Ct. App. 2009)].  There, a plaintiff alleged nonperformance of written representations, but couched her claims in tort terms (fraud, misrepresentation, etc.).  We indicated that the essential issue is not one of tort vs. contract, but of contract interpretation— does the forum selection clause apply to or reach the subject claims?  *See* 302 S.W.3d at 232.

> Here, as in *Major*, it does.  Raydiant's claims arise out of or are related to the contract, so they are within its forum selection clause.  Raydiant does not otherwise show unfairness or unreasonableness, as already noted, so we would enforce the forum selection clause under Missouri law as well.

439 S.W.3d 238, 240–41 (Mo. Ct. App. 2014) (footnote omitted).

The Restatement (Second) of Conflict of Laws is consistent with the majority approach.  It provides, "The parties' agreement as to the place of the action will be given effect unless it is unfair or unreasonable."  Restatement (Second) Conflict of Laws § 80, at 85 (Am. Law Inst. 1988 rev.).  A comment explains,

> [T]here is good reason why a court should refrain from exercising the jurisdiction it admittedly has in order to give effect to a provision in a contract that any action thereon shall be brought only in some other state.  Such a provision represents an attempt by the parties to insure that the action will be brought in a forum that is convenient to them.  It is

also a provision to which the parties have bound themselves by contract and from which a court will be reluctant to permit one of the parties to escape without the consent of the other.

*Id.* cmt. *a,* at 85. Another comment adds, "A court will entertain an action brought in violation of a choice-of-forum provision if it finds that *the provision* was obtained by fraud, duress, the abuse of economic power or other unconscionable means." *Id.* cmt. *c,* at 85. (emphasis added).

In 1982, we applied an earlier version of section 80 and held,

[C]lauses purporting to deprive Iowa courts of jurisdiction they would otherwise have are not legally binding in Iowa. We further hold, however, that under a motion to dismiss an Iowa action without prejudice on the ground of forum nonconveniens, such a clause, if otherwise fair, will be given consideration along with the other factors presented, in determining whether the Iowa court should decline to entertain the suit.

*Davenport Mach. & Foundry Co. v. Adolph Coors Co.,* 314 N.W.2d 432, 437 (Iowa 1982). At that time, section 80 read, "The parties' agreement as to the place of the action cannot oust a state of judicial jurisdiction, but such an agreement will be given effect unless it is unfair or unreasonable." Restatement (Second) of Conflict of Laws § 80, at 244 (Am. Law Inst. 1971). We then reiterated the *Davenport Machinery* holding in *Holiday Inns Franchising, Inc. v. Branstad,* 537 N.W.2d 724, 730 (Iowa 1995), and *EFCO Corp. v. Norman Highway Constructors, Inc.,* 606 N.W.2d 297, 299 (Iowa 2000).

But the Restatement has evolved since *Davenport Machinery,* and we think our rule should as well. *See Liberty Bank, F.S.B. v. Best Litho, Inc.,* 737 N.W.2d 312, 315 (Iowa Ct. App. 2007) ("A forum selection clause 'should control absent a strong showing that it should be set aside.'" (quoting *M/S Bremen,* 407 U.S. at 15, 92 S. Ct. at 1916)). As newer iterations of the Restatement emerge, our court has considered them and, as appropriate, adopted their provisions. *See, e.g., Thompson v. Kaczinski,*

774 N.W.2d 829, 839 (Iowa 2009). For example, in *Thompson*, our court became one of the first to adopt the scope-of-the-risk standard in the Restatement (Third) of Torts: Liability for Physical Harm. *Id.*

The 1988 version of section 80 does not alter the previous blackletter rule. *See* Restatement (Second) of Conflict of Laws § 80 reporter's note, at 87 (Am. Law Inst. 1988 rev.). Clearly, a private agreement cannot take away jurisdiction that an Iowa court would otherwise have. *Id.* But the 1988 version highlights that in exercising that jurisdiction, the Iowa court should ordinarily examine the forum-selection clause first and give it effect "unless it is unfair or unreasonable." *Id.* § 80, at 85.

This approach makes sound policy sense when, as here, a multimillion-dollar commercial transaction is involved. Both parties, it is conceded, were represented in connection with the Purchase Agreement.[6] If a forum-selection clause could be challenged simply based on fraud in an overall transaction, then the advantages of predictability and efficiency would be lost. Predictability would be lost because the parties would not be able to know the locus of litigation in advance (and perhaps retain counsel accordingly). Efficiency would be lost because it would be necessary to litigate the merits in order to determine the locus of litigation. In this case, plaintiffs acknowledge that it would be necessary to litigate their entire fraud claim in Iowa in order to determine whether the litigation should then proceed in Kansas.[7]

---

[6]In resisting the motion to dismiss below, plaintiffs submitted documentation indicating that they were represented by counsel in connection with the Purchase Agreement.

[7]Under the majority approach that we approve of today, it is certainly possible for a forum-selection clause not to be enforced. One illustration is *Petersen v. Boeing Co.*, where the facts were as follows:

> [Peterson's] sworn affidavit states that the initial employment contract he signed in the United States made no mention of a Saudi forum selection clause, but that he was required to sign a new employment contract

Accordingly, we agree with the district court that the plaintiffs' general allegations of fraud in the inducement are insufficient to avoid enforcement of paragraph 9 of the Purchase Agreement.[8]

**V. Do Plaintiffs' Other Grounds for Avoiding the Forum-Selection Clause Have Merit?**

**A. The Assertion that Iowa Has a Larger Stake Than Kansas.** The plaintiffs urge that Iowa has a far greater stake in this controversy because both they and the defendants are based in Iowa—the plaintiffs in Cedar Rapids and the defendants in Des Moines. The alleged fraud was perpetrated through communications that took place in Iowa.

Yet Kansas is not without ties to the controversy. The subject-matter of the contract—i.e., the Citation X—was located in Kansas. Peddler took delivery of the aircraft in Kansas and the parties agreed to

---

containing such a clause upon his arrival in Saudi Arabia. His new supervisor, however, did not permit him time to read the agreement and told him that failure to sign it would result in his being forced to return immediately to the United States at his own expense.

715 F.3d 276, 282–83 (9th Cir. 2013) (holding that the district court should have "at the very least" held an evidentiary hearing).

[8]Notably, in those circumstances where the legislature believes forum-selection clauses should not be given effect, it has expressly said so. *See* Iowa Code § 322A.19(1) (2015) (motor vehicle dealer franchises); *id.* § 523H.3(1) (other franchises); *id.* § 537A.10(3)(*a*) (franchise agreements); *id.* § 633D.8(7) (claims against a beneficiary of a transfer on death security registration).

The legislature has also provided that tort claims should not be subject to *arbitration* "[u]nless otherwise provided in a separate writing executed by all parties to the contract." *Id.* § 679A.1(2)(*c*). The FAA, however, does not recognize this limitation, and the FAA preempts contrary state law with respect to any "contract evidencing a transaction involving commerce." *See Heaberlin Farms, Inc. v. IGF Ins.*, 641 N.W.2d 816, 819 (Iowa 2002) (quoting *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272–75, 115 S. Ct. 834, 839–40 (1995)). It is important to note, however, that the legislature has not adopted legislation similar to Iowa Code section 679A.1(2)(*c*) regarding forum-selection clauses. The considerations are different because a forum-selection clause requiring litigation in another state does not deprive the plaintiff of a jury trial or any other trial right, whereas an arbitration clause does. *See Bryant v. Am. Express Fin. Advisors, Inc.*, 595 N.W.2d 482, 484 (Iowa 1999) ("[A] jury trial is obviously not a part of arbitration.").

Kansas law. Under section 80 of the Restatement, it is not enough that a balance of convenience favors Iowa. Restatement (Second) of Conflict of Laws § 80 cmt. *c*, at 86. Rather, this must be "the rare situation where the chosen state would be a seriously inconvenient place for the trial and that trial in the state of the forum would be far more convenient." *Id.* Moreover,

> [a] significant factor in this regard is whether the chosen state is also declared in the contract to be the state of the governing law. This might be thought to suggest that the parties would have wished to have the action brought in the chosen state even in the case of substantial inconvenience.

*Id.*

**B. The Assertion that the Oral Agreement Controls and that the Purchase Agreement Should Not Be Considered as Part of the Record.** Next, the plaintiffs argue that they are relying on a preceding oral agreement, not the parties' later written Purchase Agreement. However, the written Purchase Agreement is properly considered part of the record. It was filed as an exhibit to the motion to dismiss. The parties do not dispute its authenticity; they debate only its legal significance. When dismissal is sought for improper venue, the court may consider a written contract that is the basis for the improper venue claim. *See EFCO Corp.*, 606 N.W.2d at 300 (indicating that a motion to dismiss based on a choice-of-forum clause may present issues of fact for the district court to resolve); *see also King v. State*, 818 N.W.2d 1, 6 n.1 (Iowa 2012) (holding that even in ruling on a motion to dismiss for failure to state a claim, the court may consider documents referenced in the petition regardless of whether they have been attached). This does not transform the matter into a full-fledged summary judgment proceeding. The Purchase Agreement has an integration clause, indicating that it "supersedes all prior written or oral

agreements, representations, negotiations, proposals or discussions between the parties with respect to its subject matter."

**C.  The Assertion that Plaintiffs Will Be Deprived of a Remedy if Forced to Litigate in Kansas.**  The plaintiffs contend that forcing them to litigate in Kansas will subject them to a two-year or three-year Kansas statute of limitations and thus deprive them of a day in court.  *See* Kan. Stat. Ann. §§ 60-512, 60-513(a)(3) (West, Westlaw current through 2019 Reg. Sess., July 1, 2019).  We make no determination on these matters. But three points should be noted.

First, the parties agreed that Kansas law governed this transaction, *in addition to* agreeing to a Kansas forum.  We have previously declined to apply Iowa's more generous statute of limitations when an action would be time-barred under the statute of limitations of the state whose substantive law is applied.  *Harris v. Clinton Corn Processing Co.*, 360 N.W.2d 812, 816 (Iowa 1985).  So it is not clear that keeping this case in Iowa would salvage the plaintiffs' claims.  If Kansas substantive law applied, plaintiffs' claims would be subject to the Kansas statute of limitations even if they were litigated in Iowa.

Second, we acknowledge that the Restatement states, "[E]ffect might be denied a choice-of-forum provision calling for suit in a state where the period of the statute of limitations applicable to the particular claim was unusually short and had already expired."  Restatement (Second) of Conflict of Laws § 80 cmt. *c*, at 86.  But we do not consider two or three years to be "unusually short."  For example, Georgia, Oregon, Pennsylvania, and Virginia also have a two-year statute of limitations for fraud.  *See* Ga. Code Ann. § 9-3-33 (West, Westlaw through 2019 Reg. Sess.); Or. Rev. Stat. Ann. § 12.110 (West, Westlaw through 2018 Reg. Sess. & Spec. Sess.); 42 Pa. Stat. and Cons. Stat. Ann. § 5524(7) (West,

Westlaw through 2019 Reg. Sess. Act 87); Va. Code Ann. § 8.01-243 (West, Westlaw through 2019 Reg. Sess.).

Third, it is worth noting that the alleged fraud was discovered in February 2015, and Peddler filed its first lawsuit in February 2015. That lawsuit was timely under any conceivable statute of limitations. However, in December 2016, Peddler voluntarily dismissed it without prejudice, and the plaintiffs waited until February 2018 to file a new action. If a limitations problem has arisen, it may well be due to Peddler's voluntary dismissal of the prior lawsuit.

## VI. Conclusion.

For the foregoing reasons, we affirm the district court's dismissal of this action based on the forum-selection clause.

**AFFIRMED.**

All justices concur except Appel, J., who dissents.

**APPEL, Justice (dissenting).**

I respectfully dissent. For the reasons expressed below, I do not find the United States Supreme Court case of *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 87 S. Ct. 1801 (1967), or its copycat case in Iowa, *Dacres v. John Deere Insurance Co.*, 548 N.W.2d 576 (Iowa 1996), to be useful or instructive on the precise question before us.

While *Prima Paint*, and presumable *Dacres*, were based upon a strong federal substantive policy in favor of arbitration under the Federal Arbitration Act (FAA), there is no statutory public policy on forum selection in Iowa. Our caselaw, however, refuses to enforce them based on public policy grounds. *See Davenport Mach. & Foundry Co. v. Adolph Coors Co.*, 314 N.W.2d 432, 437 (Iowa 1982) ("After consideration of *Field* [*v. Eastern Building & Loan Ass'n,* 117 Iowa 185, 90 N.W. 717 (1902)] and the other authorities, we hold that clauses purporting to deprive Iowa courts of jurisdiction they would otherwise have are not legally binding in Iowa."). There is therefore no basis in Iowa law for departing from the traditional rule that when fraud in the inducement is alleged, a plaintiff may bring an action in an Iowa court with personal and subject matter jurisdiction seeking to rescind the entire contract notwithstanding a forum-selection provision in the contract which the plaintiff seeks to rescind.

I. **Traditional Fraud-in-the-Inducement Doctrine.**

A. **Fraud in the Inducement as a Tort Action with a Remedy of Rescission.** Fraud in the inducement gives rise to a tort claim for damages. *Hyler v. Garner,* 548 N.W.2d 864, 870 (Iowa 1996) ("Fraudulent inducement also gives rise to a tort claim for damages."). A plaintiff alleging fraud in the inducement may seek rescission of the subsequent contract. *Id.* at 871. When rescission rather than damages is sought,

relief may be obtained without proof of scienter or pecuniary damage. *Id.*; *see also First Nat'l Bank in Lenox v. Brown,* 181 N.W.2d 178, 182 (Iowa 1970).

Parol evidence is admissible to prove fraud in the inducement. *Scheel v. Super. Mfg. Co.,* 249 Iowa 873, 880, 89 N.W.2d 377, 382 (1958) ("Parol evidence is admissible to prove fraud that induced the writing."). Further, a plaintiff can reach individuals as defendants who participated in fraud in the inducement who could not be reached under a contract theory. *First Fin. USA, Inc. v. Steinger,* 760 So. 2d 996, 997–98 (Fla. Dist. Ct. App. 2000).

Punitive damages are generally available for aggravated cases of fraud in the inducement. *See, e.g., Conn. Gen. Life Ins. v. Jones,* 764 So. 2d 677, 682 (Fla. Dist. Ct. App. 2000); *Wiley v. Adkins,* 48 S.W.3d 20, 23 (Ky. 2001); *Mills v. Koscot Interplanetary Inc.,* 187 S.E.2d 372, 376 (N.C. Ct. App. 1972). The same rationale extends under Iowa law. *Ryan v. Arneson,* 422 N.W.2d 491, 496 (Iowa 1988) ("Punitive damages, on the other hand, are not compensatory. They exist to punish the defendant and to deter the offending party and like-minded individuals from committing similar acts." (Citation omitted.)).

**B. The Remedy of Rescission Ordinarily Invalidates the Entire Contract.** "Ordinarily, rescission must be of the whole contract, though there may be partial rescission in case of severable provisions." *Butler Mfg. Co. v. Elliott & Cox,* 211 Iowa 1068, 1071, 233 N.W. 669, 670 (1930). "Whether a contract is entire or severable depends upon the intention of the parties, manifested by their acts and by the circumstances of each particular case." *Inman Mfg. Co. v. Am. Cereal Co.,* 124 Iowa 737, 741, 100 N.W. 860, 861 (1904). For example, "[i]f several articles are bought for a separate price with a warranty applicable to each article, and the

warranty as to one or more articles is broken, it is said that rescission may be had for such articles as do not comply with the warranty." 26 Richard A. Lord, *Williston on Contracts: A Treatise on the Law of Contracts* § 68:17, at 213 (4th ed. 2019). There has been no rule of law dictating that certain types of provisions are categorically "severable."

**II. FAA Ousts Traditional State Court Jurisdiction of Fraud-in-the-Inducement Claims Based Solely on Federal Arbitration Policy.**

**A. *Prima Paint*: FAA as a Sleeping Giant with a Very Large Federal Statutory Club.** Although the traditional common law rule is that a contract formed based upon fraud in the inducement is subject to complete rescission, the United States Supreme Court held that federal law overrode traditional state common law in *Prima Paint Corp.*, 388 U.S. 395, 87 S. Ct. 1801.

The FAA was originally enacted in 1925. *See* United States Arbitration Act, Pub. L. No. 68-401, 43 Stat. 883–86 (1925) (codified as amended as Federal Arbitration Act, 9 U.S.C. §§ 1–4). For the first forty years, there was little controversy under the FAA. In *Prima Paint*, however, the Supreme Court considered a case where a contract containing an arbitration clause was attacked on the ground that it was fraudulently induced. 388 U.S. at 396–97, 87 S. Ct. at 1802. The question was whether the claim of fraud in the inducement could be considered by a court or whether the fraud-in-the-inducement claim should be resolved by an arbitrator as provided in the challenged contract. *Id.* at 402, 87 S. Ct. at 1805. The contract in question involved interstate commerce and was subject to the FAA. *Id.* at 401–02, 87 S. Ct. at 1804–05.

In approaching the question, the *Prima Paint* Court considered three provisions of the Act. As noted in *Prima Paint*,

> Section 2 provides that a written provision for arbitration "in any maritime transaction or a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Section 3 requires a federal court in which suit has been brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" to stay the court action pending arbitration once it is satisfied that the issue is arbitral under the agreement. Section 4 provides a federal remedy for a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration," and directs the federal court to order arbitration once it is satisfied that an agreement for arbitration has been made and has not been honored.

*Id.* at 400, 87 S. Ct. at 1804.

The majority in *Prima Paint* held, as a matter of substantive law arising from the FAA, that a provision in a contract calling for arbitration of disputes is separable from the rest of the contract notwithstanding the traditional approach of otherwise applicable state law. *Id.* at 402–04, 87 S. Ct. at 1805. The *Prima Paint* Court stated that under § 4, "the federal court is instructed to order arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration or the failure to comply (with the arbitration agreement) is not in issue.'" *Id.* at 403, 87 S. Ct. at 1806 (quoting 9 U.S.C. § 4). From this premise, the Court declared *ipse dixit* that "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Id.* at 404, 87 S. Ct. at 1806. The majority's statutory analysis consists of two brief conclusory paragraphs.

Justice Black, joined by Justices Douglas and Stewart, dissented. Justice Black declared that the holding of the majority was "fantastic." *Id.* at 407, 87 S. Ct. at 1808 (Black, J., dissenting). He was incredulous that a court would lose its legal prerogative of whether any legal contract exists upon which to base arbitration. *Id.*

Justice Black noted that under § 4, the question was what kind of pleading puts in issue the "making of the agreement for arbitration," and the approach of the majority "elevates arbitration provisions above all other contractual provisions." *Id.* at 410, 87 S. Ct. at 1809 (quoting 9 U.S.C. § 4).

Justice Black emphasized the language in § 2 of the FAA. He noted that under § 2, an agreement to arbitrate is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* at 412, 87 S. Ct. at 1810 (quoting 9 U.S.C. § 2). According to Justice Black, fraud is one of the most common grounds for revoking a contract, and further declared that if the contract was procured by fraud, "then, unless the defrauded party elects to affirm it, there is absolutely no contract, nothing to be arbitrated." *Id.*

Justice Black defended his textual reading with legislative history. He harnessed numerous statements by lawmakers and advocates of the FAA suggesting that the provisions would not apply to contracts procured by fraud related to the entire contract. *Id.* at 413–14, 87 S. Ct. at 1810–11.

Justice Black declared that the majority approach was a "statutory mutilation." *Id.* at 416, 87 S. Ct. at 1812. All the Act was intended to do, according to Justice Black, was to "make arbitration agreements enforceable in federal courts if they are valid and legally existent under state law." *Id.* at 422, 87 S. Ct. at 1815. The sole purpose of the Act, Black opined, was to place arbitration agreements "on the same footing as other contracts." *Id.* at 423, 87 S. Ct. at 1816 (quoting H.R. Rep. No. 68-96 (1924)).

**B.** *Southland Corporation*: **The Giant Swings the Very Large Federal Statutory Club and Preempts State Courts**. Fifteen years after

*Prima Paint*, the United States Supreme Court considered in *Southland Corp. v. Keating*, 465 U.S. 1, 104 S. Ct. 852 (1984), whether the FAA preempted a provision of the California Franchise Investment Law, which required that claims under the state statute be decided by courts. *Id.* at 4–5, 104 S. Ct. at 855–56. The *Southland* majority determined that the California statute was so preempted. *Id.* at 16, 104 S. Ct. at 861. The *Southland* majority declared that the FAA created "a body of federal substantive law." *Id.* at 12, 104 S. Ct. at 859. The *Southland* majority emphasized that Congress was concerned not only with the common law hostility toward arbitration, but with the failure of state arbitration statutes to mandate enforcement of arbitration agreements. *Id.* at 13–14, 104 S. Ct. at 859–60.

Justice O'Connor, joined by Justice Rehnquist, dissented. She noted that §§ 3 and 4 of the FAA expressly deal with matters "brought in *any of the courts of the United States*" and "*any United States district court.*" *Id.* at 22, 104 S. Ct. at 864 (O'Connor, J., dissenting) (quoting 9 U.S.C. §§ 3, 4 (emphasis added)). Justice O'Connor rejected the notion that the silence of Congress in § 2 of the Act could be interpreted to extend its provisions to state courts when §§ 3 and 4 were expressly limited to federal courts. *Id.*

Further, Justice O'Connor wrote that the legislative history is unambiguous. *Id.* at 25, 104 S. Ct. at 865. She declared that the legislative history clearly established that the statute only addressed procedural questions in federal court. *Id.* at 25, 104 S. Ct. at 865–66. Like Justice Black in *Prima Paint*, Justice O'Connor assembled a number of statements from legislative leaders and advocates emphasizing the narrowness of the statute. *Id.* at 25–30, 104 S. Ct. at 865–68. As a result,

§ 2 "should have no application whatsoever in state courts." *Id.* at 31, 104 S. Ct. at 868.

Justice O'Connor continued to dissent from application of the FAA to state court proceedings in subsequent cases. *See Perry v. Thomas*, 482 U.S. 483, 494–95, 107 S. Ct. 2520, 2528 (1987) (O'Connor, J., dissenting); *York Int'l v. Ala. Oxygen Co.*, 465 U.S. 1016, 104 S. Ct. 1260 (1984) (mem) (O'Connor, J., dissenting).

Finally, however, in *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 115 S. Ct. 834 (1995), Justice O'Connor threw in the towel based on stare decisis. *Id.* at 282–83, 115 S. Ct. at 843–44 (O'Connor, J., concurring). But now, Justice Scalia picked up the torch. Justice Scalia came to what he characterized as the belated conclusion that Justice O'Connor had been right all along and that stare decisis did not prevent correction of the mistake. *Id.* at 284, 115 S. Ct. at 845 (Scalia, J., dissenting). Then Justice Thomas entered the fray, declaring that the FAA simply did not apply in state courts. *Id.* at 285, 115 S. Ct. at 845 (Thomas, J., dissenting).

Finally, in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S. Ct. 1740 (2011), the Supreme Court considered whether federal courts could apply the doctrine of unconscionability as developed in California law in refusing to enforce an arbitration agreement otherwise subject to the FAA. *Id.* at 338, 131 S. Ct. at 1745. In a 5–4 decision written by Justice Scalia, the majority held that the unconscionability claim was preempted. *Id.* at 352, 131 S. Ct. at 1753.

But Justice Breyer and three other Justices came to a different conclusion. They emphasized the language in § 2 of the FAA, which provided that arbitration agreements would be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.*

at 354, 131 S. Ct. at 1754 (Breyer, J., dissenting) (quoting 9 U.S.C. § 2). According to Justice Breyer, the purpose of the Act was to place agreements to arbitration and agreements to litigate "upon the same footing." *Id.* at 360, 131 S. Ct. at 1757 (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511, 94 S. Ct. 2449, 2453 (1974)).

Although there can be no question that the United States Supreme Court's decisions are authoritative arbiters of federal law, the above case history shows that the terrain under the FAA has been, and continues to be, highly contested. From reading the cases, one gets the impression that the beast released in *Prima Paint* has turned out to be something of a wild animal that the Supreme Court has been unable to track down and cage.

**C. The Scholarly Response to the *Prima Paint/Southland* Line of Cases.**

1. *Statutory interpretation.* The Supreme Court's approach to statutory interpretation of the FAA reflected in *Prima Paint* and *Southland* has not been well received by scholars. Academic observers have noted that the approach of United States Supreme Court majorities has been completely inconsistent with the text and legislative history of the FAA. *See generally* Paul D. Carrington & Paul H. Haagen, *Contract and Jurisdiction*, 1996 Sup. Ct. Rev. 331 (analyzing commercial arbitration law cases from the 1994 and 1995 terms of the United States Supreme Court); Margaret L. Moses, *Statutory Misconstruction: How the Supreme Court Created a Federal Arbitration Law Never Enacted by Congress*, 34 Fla. St. U. L. Rev. 99 (2006) (finding that judicial construction has improperly broadened the FAA beyond its originally intended purpose); David S. Schwartz, *Correcting Federalism Mistakes in Statutory Interpretation: The Supreme Court and the Federal Arbitration Act*, 67 L. & Contemp. Probs. 5

(2004) (characterizing the *Southland* decision as incorrectly preempting states' ability to regulate arbitration).

The doctrine of separability has come under an especially hard-hitting attack. *See, e.g.,* Richard C. Reuben, *First Options, Consent to Arbitration, and the Demise of Separability: Restoring Access to Justice for Contracts with Arbitration Provisions*, 56 S.M.U. L. Rev. 819, 872–82 (2003) (calling for the Court to overturn the separability doctrine); Jean R. Sternlight, *Rethinking the Constitutionality of the Supreme Court's Preference for Binding Arbitration: A Fresh Assessment of Jury Trial, Separation of Powers, and Due Process Concerns,* 72 Tul. L. Rev. 1, 9–10 (1997) ("[T]he Supreme Court's interpretation of the FAA as favoring arbitration over litigation is not merely bad as a matter of policy, but also is often inconsistent with the proper interpretation of the Constitution." (Footnote omitted.)); Katherine Van Wezel Stone, *Rustic Justice: Community and Coercion Under the Federal Arbitration Act*, 77 N.C. L. Rev. 931, 943–69 (1999).

The explicit battle lines on the statutory interpretation front have been twofold: First, is the FAA a procedural statute or a broad substantive act? Second, does the FAA apply at all in state courts? In order to answer yes to these questions, United States Supreme Court majorities have adopted a robust substantive view of the FAA. In other words, these majority decisions are powered by claims that Congress, pursuant to its commerce power, intended a strong substantive policy in favor of arbitration that overrides traditional principles of federalism. In any event, the Supreme Court's FAA precedents are rooted in the view that the FAA is a Congressional mandate imposing a very strong federal policy in favor of arbitration that overrides any weak-kneed state policy.

2. *Problem of perverse incentives.* Aside from attacking the United States Supreme Court's statutory interpretation, the policy wonks in academia have noodled about the merits of the federal policy discovered by the Supreme Court in its FAA cases. The scholars have emphasized at least two problems. First, an arbitrator is ordinarily paid for their work on an hourly basis. To the extent arbitrators are invested with the power to decide fraud in the inducement issues, they undeniably have a financial incentive to decide the question against dismissal. *See generally* Carrie Menkel-Meadow, *Do the "Haves" Come Out Ahead in Alternative Judicial Systems?: Repeat Players in ADR*, 15 Ohio St. J. Disp. Resol. 19, 20 (1999) [hereinafter Menkel-Meadow, *Repeat Players*].

In a court system, such a financial incentive could well be found to violate due process. *See Connally v. Georgia*, 429 U.S. 245, 247, 251, 97 S. Ct. 546, 547, 549 (1977) (per curiam) (finding payment to a justice of the peace who signs a search warrant on a per warrant issued basis creates pecuniary interest sufficient to establish a due process violation); *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S. Ct. 1689, 1698 (1973) (finding that a state agency composed of independent optometrists is biased in proceedings against optometrists who work for corporations because of pecuniary interest). This highly undesirable result of *Prima Paint* was not expressly considered by the Court, but is enough to give us pause as to whether the *Prima Paint* rule should be cut and pasted into state law contexts.

And, there is the further problem of repeat players. An arbitrator may be inclined to favor a repeat player rather than a party likely appearing as a "one off." The repeat-player problem has been recognized by Justice Ginsburg in *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 96, 121 S. Ct. 513, 524 (2000) (Ginsburg, J., concurring in

part and dissenting in part).  *See* Lisa B. Bingham, *Self-Determination in Dispute System Design and Employment Arbitration*, 56 U. Miami L. Rev. 873, 889–902 (2002); Menkel-Meadow, *Repeat Players*, 5 Ohio St. J. Disp. Resol. at 20.

### III. State Court Responses to *Prima Paint* with Respect to Arbitration Provisions Governed by State Law.

A separate issue is whether state courts should adopt the severability doctrine of *Prima Paint* in cases that do not involve interstate commerce and thus are not governed by federal law.  Some states refuse to enforce arbitration clauses as a matter of public policy.  *See, e.g., Wells v. Mobile Cty. Bd. of Realtors, Inc.*, 387 So. 2d 140, 144 (Ala. 1980) ("The public policy of this state is to encourage arbitration . . .; but public policy also holds void an agreement . . . to oust or defeat the jurisdiction of all courts, as to all differences between parties.").  In those states, *Prima Paint* has no applicability under state law.

A number of state courts have uncritically adopted *Prima Paint* for purposes of state law without meaningful discussion.  For example, in *Two Sisters, Inc. v. Gosch & Co.*, 370 A.2d 1020, 1022–23 (Conn. 1976), the Connecticut court simply cited and applied *Prima Paint* to a contract governed by state law. Authorities like *Two Sisters* are cases where federal law is uncritically cut and pasted into state law without consideration of whether *Prima Paint* was correctly decided or whether the *federal* statutory underpinning miraculously discovered by a majority of the United States Supreme Court in *Prima Paint* forty years after the FAA was enacted has a *state* statutory analogue.  These conclusory state court citations to a conclusory federal court opinion have, quite literally, no persuasive value.

Several states, however, have either declined to adopt *Prima Paint* under state law or have significantly limited its scope.  For instance, in

*Paramore v. Inter-Regional Financial Group Leasing Co.*, 316 S.E.2d 90, 92 (N.C. Ct. App. 1984), a North Carolina court held that when a lease may be invalid due to lack of consent, fraud, or undue duress, or contained unconscionable terms, the *Prima Paint* rule would not apply where there was no "substantial interstate activity" and, as a result, state law governed the transaction.

Similarly, in *Shaffer v. Jeffery*, 915 P.2d 910, 916–18 (Okla. 1996), the Oklahoma Supreme Court refused to follow *Prima Paint* under state law employing reasoning similar to Justice Black's dissent in *Prima Paint*. According to *Shaffer*, "the court is best suited to determine issues such as fraud." *Id.* at 917. The North Carolina court declared that

> if Plaintiffs allege fraud in the inducement of the arbitration clause itself or the underlying contract of which the arbitration agreement is a part, the District Court must adjudicate that issue prior to granting . . . any relief based upon the validity of the arbitration clause.

*Id.* at 917–18. Justice Black's dissent was also the basis of a ruling contrary to *Prima Paint* in *City of Blaine v. John Coleman Hayes & Associates, Inc.*, 818 S.W.2d 33, 38 (Tenn. Ct. App. 1991). In its holding, the Tennessee court examined a state statute similar to the FAA, extensively citing Justice Black's dissenting opinion. *Id.* at 37–38. The opinion noted that state courts have far more expertise in resolving legal issues relating to the validity of a contract and that the only advantage of submitting the issue to arbitrators is that arbitrators receive compensation. *Id.* The Tennessee court proceeded to construe its local statute in a fashion similar to Justice Black's dissent in *Prima Paint*. *Id.*

A Louisiana court applied Justice Black's reasoning in *George Engine Co. v. Southern Shipbuilding Corp.*, 350 So. 2d 881, 886 (La. 1977). According to the court,

> This Court's jurisdiction cannot be displaced whenever a contract contains an arbitration clause. The arbitration law and arbitration clauses in contracts do not vest in arbitrators the historic jurisdiction of the courts to determine fraud or duress in the inception of a contract. It may be said that courts are far better qualified to decide issues of this kind.

*Id.* at 884.

In *Shaw v. Kuhnel & Associates, Inc.*, 698 P.2d 880, 881–82 (N.M. 1985), the New Mexico Supreme Court, like Justice Black, used strong language to describe the notion that an arbitration provision was severable in the face of an allegation of fraud in the inducement. The New Mexico Supreme Court stated that

> [i]t would be ridiculous and contrary to the statutory language to require parties to arbitrate an issue of fraud in the inducement only to have the arbitration clause declared invalid if such fraud is found to exist by the arbitrator. This would force parties to arbitrate an issue which by statute would invalidate the arbitration clause.

*Id.*

Nothing in these cases, of course, is binding in Iowa on the issue before us. What the state cases do show, however, is that the severability doctrine embraced in *Prima Paint* as it relates to arbitration clauses is not universally accepted wisdom bestowed from above, to be uncritically applied in state courts.

**IV. Textual Differences Between The Iowa Arbitration Act and the Federal Arbitration Act.**

**A. The Iowa Arbitration Act Requires Separate, Stand-Alone Arbitration Agreement for Future Controversies Sounding in Tort.** In 1981, the Iowa legislature enacted Iowa Code chapter 679A dealing with arbitration. 1981 Iowa Acts ch. 202 (codified at Iowa Code §§ 679A.1–.18 (1983)). It is materially different from the FAA and the caselaw generated by the United States Supreme Court. Like § 2 of the FAA, sections 1 and

2 of the Iowa Arbitration Act (IAA) provide that written agreements to submit existing or future controversies to arbitration are enforceable "unless grounds exist at law or in equity for the revocation of the written agreement" or contract. Iowa Code § 679A.1(1) (2015).

However, with respect to future controversies, the IAA excludes contracts of adhesion, contracts between employers and employees, and "[u]nless otherwise provided in a separate writing executed by all parties to the contract, any claim sounding in tort whether or not involving a breach of contract." *Id.* § 679A.1(2)(*c*). Thus, in order for an arbitration agreement, with respect to future controversies, to be enforceable, there must be a separate contract aside from the underlying contract declaring that the arbitration provision applies to claims sounding in tort. Clearly, for purposes of tort claims such as fraudulent inducement of a contract, an arbitration provision is not enforceable unless there is a separate, stand-alone agreement so stating. Thus, the doctrine of severability in *Prima Paint* does not apply under the IAA. In order to enforce an arbitration provision against a tort claim, there must be a separate, stand-alone agreement to do so. No such stand-alone agreement is present in this case.

**B. The Curious Effort to Enforce Illinois Law in *Dacres*.** We considered the applicability of *Prima Paint* in Iowa state courts in *Dacres*, 548 N.W.2d 576. In a conclusory sentence, we made the barebones declaration that *Prima Paint*, a case interpreting the FAA, "should be applied to claims made under Iowa contract law involving alleged fraud in the inducement." *Id.* at 578. We declared in another conclusory sentence that "[w]e approve that rule and apply it in the present case." *Id.* There are multiple problems lurking behind this conclusory treatment of *Prima Paint* and its potential applicability to this case.

First, the agreement containing the arbitration clause in *Dacres* provided that "the provisions of the Illinois Uniform Arbitration Act . . . shall apply and no other rules or arbitration statutes shall apply to disputes under this Agreement." Joint Deferred Appendix at 218, *Dacres*, 548 N.W.2d 576 (No. 94-1855). John Deere argued that "the Illinois courts require arbitration of a claim of fraud in the inducement as to the contract containing the arbitration provision" and supported it with a string cite of Illinois cases. Appellee's Brief at 13, *Dacres*, 548 N.W.2d 576 (No. 94-1855). Thus, looking at the four corners of the contract, the issue appeared to be a question of Illinois law, not Iowa law.[9]

In a footnote, John Deere suggested that even if Iowa law applied, the result would be the same.[10] *Id.* at 12 n.5. The footnote stated that "[j]udicial interpretation of identical or equivalent statutory language in other jurisdictions are entitled to unusual respect and deference and will usually be followed if sound, reasonable, and in harmony with justice and public policy." *Id.* But as seen above, the difference between the FAA and Iowa Code section 679A.1(2) is substantial. That footnote is misleading to the extent it suggests the statutes are identical.

Second, even if an issue of Iowa law was raised, the *Dacres* court gave it no serious consideration. Was *Prima Paint* really correct? What about Justice Black's dissent? Does a state have different interests in arbitration than Congress? And while *Prima Paint* is the authoritative

---

[9]One wonders whether the reference to "under Iowa law" in *Dacres* was a mistake and that it should have read "under Illinois law" as argued by John Deere. The Illinois courts had repeatedly adopted *Prima Paint* in its interpretation of an Illinois arbitration statute.

[10]Although not stated in the *Dacres* opinion, there was a good reason not to construe the underlying contract according to Illinois law. Under Iowa law, a forum-selection provision is not enforceable. *Davenport Mach. & Foundry Co.*, 314 N.W.2d at 437.

interpretation of federal law under the FAA, the materially different Iowa statute should at least fire the judicial imagination and suggest that Iowa law might have different policy footing. Indeed, a simple comparison of the FAA and Iowa Code section 679A.1(2) gives rise to several basic questions: Why does Iowa law require a separate agreement in order for future tort claims to be subject to arbitration? What is the public policy behind that provision? Isn't a claim of fraud in the inducement a tort under Iowa law? These questions, certainly, were not asked, let alone answered, in *Dacres*. The *Dacres* reasoning is not weak, it is nonexistent.

Third, whatever the validity of *Prima Paint* and *Dacres*, these cases have nothing to do with a forum selection provision. As a result, the basis for the United States Supreme Court's decision in *Prima Paint*, and our cut and paste adoption of *Prima Paint* in *Dacres*, has no bearing on the issue we face; namely, whether a forum-selection provision is "separable" from a contract under attack for fraud in the inducement. What the above discussion demonstrates, however, is that *Dacres* is very weak precedent, has no persuasive power, and should not be claimed as authoritative outside of the narrowest possible legal context.

**V. Application of the Traditional Fraud-in-the-Inducement Approach to the Forum-Selection Clause in this Case.**

**A. General Enforceability of Forum-Selection Clauses.** Historically, forum-selection provisions in contracts have been highly disfavored in the courts. The general theory behind the hostility to forum-selection clauses is the notion that private parties cannot divest the constitutionally or statutorily established jurisdictions of courts not designated in the clause. *See* Michael D. Moberly & Carolyn F. Burr, *Enforcing Forum Selection Clauses in State Court*, 39 Sw. L. Rev. 265, 265–66 (2009) [hereinafter Moberly & Burr, *Enforcing Clauses*].

The trend in the law changed, however, when the United States Supreme Court decided *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S. Ct. 1907 (1972).  In *M/S Bremen*, the Supreme Court held that, at least in maritime matters, forum-selection provisions, if reasonable, would be enforced.  *Id.* at 17–18, 92 S. Ct. at 1917; *see also Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595, 111 S. Ct. 1522, 1528 (1991); *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 28 n.7, 108 S. Ct. 2239, 2243 n.7. (1988).

With the thunderclap of the federal Zeus, many timid state court minnows scattered.  While no one has claimed that *M/S Bremen-Carnival Cruise Lines-Stewart* preempt state law, many states have followed the United States Supreme Court's lead in cut-and-paste local application of federal jurisprudence.  Other states, however, have declined to depart from the traditional view.  *See* Phoebe Kornfeld, *The Enforceability of Forum-Selection Clauses After* Stewart Organization, Inc. v. Ricoh Corporation, 6 Alaska L. Rev. 175, 186 n.64 (1989) (listing jurisdictions departing from the traditional view).  While there has been a shift in recent years in the direction of enforcing forum-selection clauses, judicial hostility toward them is by no means dead.  *See* Moberly & Burr, *Enforcing Clauses*, 39 Sw. L. Rev. at 266–67.

**B. Iowa Common Law Public Policy Adverse to Private Forum Selection Is the Polar Opposite of the Federal Public Policy Advancing Arbitration.**  Although there has been a general trend to follow *M/S Bremen*, Iowa caselaw has defied the trend.  Historically, we held in *Field* that parties may not by contract deprive a court of jurisdiction that they would otherwise possess.  117 Iowa at 205, 90 N.W. at 724.  More recently, in *Davenport Machine & Foundry Co.*, 314 N.W.2d at 437, we refused to follow the trend and maintained the traditional view that forum-selection

provisions are not enforceable in Iowa courts. The *Davenport Machine* case has been subject to negative commentary in a student note. *See generally* Jeffrey T. Mains, *Forum-Selection Clauses in Iowa: Re-Evaluation of the Iowa Position in Light of* Carnival Cruise Lines, 43 Drake L. Rev. 191 (1994). *Davenport Machine*, however, has not been overturned on this point.

Even if *Davenport Machine* were to be abandoned, there would remain a fundamental difference between forum-selection and arbitration clauses. Under federal law, and through preemption, powerful substantive statutory policy has been employed to defeat the ordinary common law of contracts. Here, not only is there no affirmative statutory policy to enforce forum-selection provisions, but the public policy expressed in the not-yet-abandoned caselaw is just the opposite. Even if one believes that *Davenport Machine* is incorrect, there is no statutory public policy driving this court to modify the traditional approach to common law.

**C. Severability of Forum-Selection Clauses in Contracts Attacked Based on Fraud in the Inducement in Other Jurisdictions.** The majority of cases that have considered the matter have concluded that, like arbitration clauses, forum-selection clauses are severable when confronted with a fraud in the inducement claim. *See Edge Telecom, Inc. v. Sterling Bank*, 143 P.3d 1155, 1162 (Colo. App. 2006); *Holeman v. Nat'l Bus. Inst., Inc.*, 94 S.W.3d 91, 102 (Tex. App. 2002) ("[A] court determining whether or not to enforce a forum selection clause will not inquire into the enforceability of the contract in which that clause is found."), *abrogated in part on other grounds as recognized in Diamond Offshore (Bermuda) Ltd. v. Haaksman*, 355 S.W.3d 842, 846 (Tex. App. 2011). In none of these states, however, is there good caselaw standing for the proposition that public policy will not enforce a forum-selection provision.

In any event, there is a notable minority position. Specifically, in *Energy Claims Ltd. v. Catalyst Investment Group, Ltd.*, 325 P.3d 70, 86 (Utah 2014), the Utah Supreme Court held that a district court should address the question of fraudulent inducement before enforcing a forum-selection clause in a contract. *Id.* at 86. The Utah court noted that it was not persuaded that its approach would allow the plaintiff to freely dodge forum-selection clauses because the challenger must plead fraud with particularity and the district court has the discretion to order an evidentiary hearing on the matter. *Id.* at 85–86.

Similarly, in *Johnson v. Key Equipment Finance*, 627 S.E.2d 740, 742 (S.C. 2006), the South Carolina Supreme Court held that a fraud claim could defeat enforcement of a contract containing a choice-of-law and forum-selection provision. Courts in Georgia, New York, and Tennessee have taken similar approaches. *See SRH, Inc. v. IFC Credit Corp.*, 619 S.E.2d 744, 745–46 (Ga. Ct. App. 2005); *DeSola Grp., Inc. v. Coors Brewing Co.*, 605 N.Y.S.2d 83, 84 (App. Div. 1993); *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 631–32 (Tenn. Ct. App. 2000).

**VI. Discussion of Application of Severability of Forum-Selection Clauses to Contracts Attacked as Fraudulently Induced Under Iowa Common Law.**

Based on the above discussion, I would conclude that the district court erred in dismissing plaintiff's claim based on the severability of the forum-selection clause. While the defendant relies on *Prima Paint* and *Dacres*, for the reasons expressed above, I would find such reliance completely unpersuasive and would not rely upon these precedents to resolve the very different question posed in this case.

In considering the issue of severability of a forum-selection provision, the public policy of Iowa, as expressed in Iowa caselaw, is that

forum-selection clauses are unenforceable. *Davenport Machine* prevents private parties from agreeing, among themselves, to simply oust state court jurisdiction through private forum-selection agreements.

There is a larger concern applicable here where a claim is made that a contract containing a forum-selection provision was fraudulently induced. Fraud in the inducement is, of course, a tort claim. When tort law is involved in a dispute, more is at stake than the mere ordering of private rights. Indeed, the public interest is directly affected. That is why the IAA, in Iowa Code section 679A.1(2)(*c*), excluded future tort controversies from mandatory arbitration. Tort actions are necessarily infused with the strong public policy goal of deterring similar conduct in the future.

As noted in a prominent case, "fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists." *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 341 (E.D. Pa. 2003). Similarly, another court has stated "that fraud in the inducement involves the breach of duties imposed as a matter of social policy, rather than the breach of duties that flow from the parties' contract." *KMB Shamrock, Inc. v. LNR Transp., Inc.*, No. 09 CV 9046, 2015 WL 13779752, at *6 (Pa. Ct. Com. Pl. Sept. 25, 2015); *see also Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc.*, 885 F. Supp. 2d 767, 790 (E.D. Pa. 2012) (finding fraud in the inducement "constitutes a breach of duties of honesty imposed by society, not contractual duties").

In my view, in order to protect Iowa citizens from fraud in the inducement, Iowa judges should not race from the courthouse to surrender jurisdiction pursuant to a private forum-selection provision

until the fraud-in-the-inducement question has been resolved in the Iowa courts.

This, of course, is the traditional view, well-articulated by Justice Black in his *Prima Paint* dissent. I suffer from no reformist impulse to disturb it. Iowa courts should be open for business to consider tort claims notwithstanding a private agreement to the contrary.

## VII. Conclusion.

For the above reasons, I would reverse the ruling of the district court and remand the case for further proceedings.